94 F.Supp. 77 (1950)
Ex parte SENTNER.
No. 7573(2).
United States District Court E. D. Missouri, E. D.
November 9, 1950.
*78 Morris J. Levin, of St. Louis, Mo., and David Scribner, of New York City, for petitioner.
Drake Watson, U. S. Atty., of New London, Mo., and Herbert H. Freer and William J. Costello, Asst. U.S. Attys., both of St. Louis, Mo., for U. S.
George Soll, of New York City and Benjamin Roth, of St. Louis, Mo., for American Civil Liberties Union (as amicus curiae).
HULEN, District Judge.
This is an application for a writ of habeas corpus, submitted on the pleadings. The issue resulting is  did the respondent Attorney General, in ordering petitioner held in a deportation proceeding without bail, act unreasonably?
The petition for writ of habeas corpus charges imprisonment of petitioner by confinement in the St. Louis, Missouri, City jail on orders of the Attorney General of the United States and the Agent in Charge of the Immigration and Naturalization Service of the Department of Justice, in the City of St. Louis; that bail was offered and denied; that no complaint has been lodged against petitioner and she has not been informed of the cause of her incarceration. A show cause order was issued.
The return recites petitioner is an alien residing in the United States since June 20, 1914. Custody of petitioner is admitted, "pursuant to a directive issued through the office of the Commissioner of Immigration and Naturalization, acting for and in behalf of the Attorney General of the United States in pursuance of the provisions of Public Law 831-81st Congress * * * known as the Subversive Activities Control Act of 1950". On September 1, 1949, the office of Commissioner of Immigration and Naturalization, acting in behalf of the Attorney General of the United States, issued a warrant for the arrest of petitioner preliminary to her deportation as an alien. The warrant was served October 6, 1949. Petitioner was then advised of the cause of her arrest, right to counsel, and given a copy of the warrant. While the petition does not state the release of petitioner on bail following her arrest on October 6, 1949, that conclusion is plain. There is a recital that after petitioner's arrest, hearings in the deportation proceedings were conducted, but were not concluded, and are now pending pursuant to request of petitioner for continuance. The Commissioner of Immigration and Naturalization is stated to be now ready to proceed with the hearings in the usual manner. It is alleged, on authority of Section 23 of the Subversive Activities Control Act, amending Section 20 of Immigration Act of February 5, 1917, 8 U.S.C.A. § 156, "and under the terms of the warrant of arrest as issued by the Attorney General through the Commissioner of Immigration and Naturalization * * * [the Attorney General] has directed that said petitioner be taken into custody and has in the exercise of his discretion, as by said Act in him vested, determined that said alien be continued in custody pending final determination of the deportation proceedings herein". Based on the Subversive Activities Control Act of 1950, it is claimed no ground for issuance of a writ is presented.
On the return day petitioner filed an affidavit amending her original petition, to the effect she is 44 years of age, married, and lives with her family; that she is a native of Licth, Croatia, now a part of Yugoslavia; that she has resided continuously in the United States since July, 1914; that she was educated in the public and parochial schools of the United States; that she has resided at the same address in the City of St. Louis since 1942, where she is presently living with her husband, her two minor children, now 12 and 8 years of age, both born in the City of St. Louis, her mother, *79 who is an invalid, her father and her mother-in-law. Petitioner states her occupation to be that of housewife, that she has no domestic help and that there is no one capable of maintaining the household and caring for the children and her invalid mother. The affidavit further recites that at no time was petitioner advised that her presence within the community constituted any danger to public safety or in any way imperiled the public security. Petitioner alleges that at all times she has engaged solely in lawful and peaceful pursuits in the community, and her principal activities consist in maintaining her household and raising her children. She recites that at all times she has been available and readily accessible for any proceedings that might be instituted against her, that her whereabouts at all times have been known to the agents of the Immigration and Naturalization Service, that she was out of St. Louis on one occasion since her arrest, to make a visit to her daughter and grandchildren during Christmas of last year, but with the express permission of the Immigration and Naturalization Service.
The reply challenges the legality of the warrant of September 1, 1949, as a basis for her rearrest on October 23, 1950, because said warrant had been executed on October 6, 1949, and petitioner admitted to bail thereafter on such arrest. The reply denies there was any hearing held on deportation of the petitioner, but avers no hearings have ever been commenced or held following arrest of petitioner on October 6, 1949, and that since January 25, 1950, petitioner has been awaiting word as to date and place for hearing and that the last information petitioner's counsel received was that the hearing would be indefinitely postponed.
The constitutionality of the Subversive Activities Control Act of 1950 is attacked as unconstitutional under the First Amendment, the Fifth Amendment, the Sixth Amendment, the Ninth Amendment, and Article 1, Section 8 of the Constitution of the United States.

I.
Does a warrant for arrest in a naturalization proceeding, once executed by taking the person named in the warrant into custody, continue as authority for a second arrest if the prisoner named in the warrant is released on bail? If petitioner is correct on this assignment, respondents were without authority to arrest her on October 23, 1950, based on the warrant of September 1, 1949, which was executed on October 6, 1949. Sections 22 and 23 of the Subversive Activities Control Act of 1950, 8 U.S.C.A. §§ 137 et seq., 156, predicate authority for arrest and custody of an alien upon the warrant of the Attorney General. It is conceded no second warrant was issued. The return pleads as authority for arrest and imprisonment of petitioner the warrant of September 1, 1949. The warrant showing the return is attached as an exhibit to the respondents' pleading. The return shows the manner of execution of the warrant. In the case of Doyle v. Russell, 1859, 30 Barb., N.Y., 300, an action for false imprisonment, it was held that the rearrest of a party on bail by means of the original warrant was illegal since the warrant had spent itself by the magistrate allowing the plaintiff out on bail. The Court, quoting Hawkins, 12 Hawk. P.C., ch. 13 original, Sec. 9, said: "If a constable, after he hath arrested the party by force of any warrant of a justice of the peace, suffer him to go at large, upon his promise to come again at such a time and find sureties, he cannot afterwards arrest him by force of the same warrant * * *." 30 Barb. loc. cit. 303.
Proceedings by the Immigration and Naturalization Service for deportation are civil and not criminal, but we think the Federal Rules of Criminal Procedure, 18 U. S.C.A., as to the manner of executing a warrant and making return thereon state a proposition general in its application. The warrant in this case conforms to Rule 4(b), and its manner of execution conforms to Rule 4(c), and the return to Rule 4(c) (4). Rule 9(c) (2) leaves little doubt that a warrant in a criminal case once executed is without force thereafter.
Disposition of this proceeding on the technical point of arrest without warrant would only postpone a ruling on the main question. Respondents could and no doubt would issue a new warrant and cause the *80 arrest of petitioner. We prefer to sustain or deny the writ on the issue of whether or not the Attorney General abused his discretion in denying petitioner bail, and avoid the delay and multiplicity of actions that would probably otherwise result.

II.
Respondents construe Sections 22 and 23 of the Subversive Activities Control Act of 1950 as placing in the Attorney General exclusive determination whether an alien taken into custody under the Act be continued in custody or released on bond. Petitioner challenges respondents' interpretation of Section 23 of the Act. The terms of the Act are: "Pending final determination of the deportability of any alien taken into custody under warrant of the Attorney General, such alien may, in the discretion of the Attorney General (1) be continued in custody; or (2) be released under bond * * *".
The 1950 Act fails to define clearly the powers of the Attorney General if those powers are what respondents claim. The law prior to the amendment of 1950 throws some light on the meaning to be ascribed to that part of the Act under consideration. The prior Act, 8 U.S.C.A. § 156, reads as follows: "Pending the final disposal of the case of any alien so taken into custody, he may be released under a bond in the penalty of not less than $500 * * *." (Emphasis added.)
One of the first cases to pass upon the 1917 Act held that the alien's right to bail was absolute. See Prentis v. Manoogian, 6 Cir., 16 F.2d 422. In the Prentis case the Court construed the intent of Congress to be  the word "he" referred to the alien, giving him the option of bail. Observation is made in that case, if Congress intended the Secretary to have discretion in the matter they would have said so. The Second Circuit, from which most of the immigration litigation emanates, refused to follow the Prentis case and in United States ex rel. Zapp v. District Director of Immigration & Naturalization, 2 Cir., 120 F.2d 762, 764, ruled, the words "may be released under a bond" gave the Attorney General discretionary power to allow bail. In a later case in the Second Circuit, United States ex rel. Potash v. District Director of Immigration and Naturalization, 2 Cir., 169 F.2d 747, 751, the Court held, although the Attorney General had the discretion to allow bail, this discretion was not absolute and was subject to review in a habeas corpus proceeding based on the ground the Attorney General acted arbitrarily in refusing bail. As to discretion of the Attorney General in such matters, the Court said: "The discretion of the Attorney General which we held to exist in the Zapp case is interpreted as one which is to be reasonably exercised upon a consideration of such factors, among others, as the probability of the alien being found deportable, the seriousness of the charge against him, if proved, the danger to the public safety of his presence within the community, and the alien's availability for subsequent proceedings if enlarged on bail."
The case was remanded to the trial court to consider facts bearing on the issue whether the Attorney General abused its discretion. The conclusion to be drawn from the Zapp case, as qualified by the Potash case is  under the law prior to the 1950 Act there was a conflict between the Courts of Appeal whether the right of an alien to bail is a matter of discretion in the Attorney General. Congress by the 1950 amendment took cognizance of this conflict between the Second and Sixth Circuits and wrote into the statute the law as ruled by the Second Circuit, repudiating the Sixth Circuit cases. The language of the 1950 Act is in accordance with the interpretation given to the 1917 Act by the Second Circuit.
To hold that the discretion placed in the Attorney General under the 1950 Act to release an alien on bail was absolute, without power of review by the judiciary, would lead to a very grave question as to the constitutionality of that provision of the Act. It would represent an attempt by Congress to place an act of the Attorney General bearing directly on personal liberty beyond review by the judiciary regardless of how arbitrary or unreasonable may have been the decision of the Attorney General. We are loath to impute this motive to the *81 Congress in the absence of an expression of their intention to that effect.
"In the case of all acts of Congress, such interpretation ought to be adopted as, without doing violence to the import of the words used, will bring them into harmony with the Constitution." Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 454.

III.
Did the Attorney General in causing the imprisonment of petitioner with the express intention, as set forth in the return, to continue petitioner "in custody pending final determination of deportation proceedings herein", reasonably exercise his discretion?
The case of United States ex rel. Pirinsky v. Shaughnessy, 2d Cir., 177 F.2d 708, was a test, whether the Attorney General had abused his discretion in a deportation proceeding. The alien arrested for deportation was allowed bail in the sum of $1,000. Some ten months later he was rearrested and bail was refused. Habeas corpus was applied for and the District Court sustained the writ on authority of the Potash case. The Attorney General then set the amount of bail at $25,000. Again a writ of habeas corpus was applied for. This time the writ was dismissed. The Court of Appeals reversed on the ground that the Attorney General was still acting arbitrarily in setting the amount of bail at an exorbitant figure. The Court held that there were no facts justifying the Attorney General's action since the alien had lived in this country for over 25 years, was married to an American citizen and had an infant living here, and there was no danger expected from the relator.
Petitioner was eight years old when she came to the United States from Lichth, Croatia. She has resided in the United States ever since. She was educated in the public and parochial schools of this country. Here she married and raised a family: one married daughter to whom three children have been born, and two younger children, aged twelve and eight, who reside in petitioner's home. The Government made no effort to move against the petitioner until September 1, 1949, when a warrant was issued as a preliminary step in proceeding for her deportation. Although the petitioner was living in St. Louis at the time, the warrant was not served for over a month after its issuance. Immediately on arrest under the warrant, petitioner was admitted to bail by the Federal authorities, acting under the 1917 Act. Over a year has passed and no hearings have been held on the proceedings initiated by arrest of petitioner on October 6, 1949. These facts raise a question of the deportability of the petitioner, or the desirability of the deportation of the petitioner, during the year last passed. Our confidence in the public authorities is such that if the public safety or security was jeopardized by the petitioner being at liberty on bail, they would long since have moved for her incarceration on that ground. That reason is not now urged. During the year since the warrant was issued in this case there is no dispute  petitioner has kept herself available at all times for any hearing which the Government desired to hold on her deportation and has complied with the terms of her bail bond.
With this background the bland statement is now made by respondents that petitioner was taken into custody, placed in jail, and will be continued to be held in jail "pending final determination of deportation proceedings" against her. If the Government does not move any faster in the future than it has in the past in the deportation proceedings against petitioner, it seems fair to conclude that her confinement in jail will be extended unless she is granted relief in this proceeding.
The Subversive Activities Control Act of 1950 was passed by the Congress over the veto of the President. The veto message in its inception refers to consultation with the Department of Justice and states that the Department "strongly expressed the hope that the bill would not become law". The message condemns the Act in terms that leave no doubt that in the Executive Department's opinion the Act is unconstitutional. The constitutionality of the Act is questioned on various grounds. We quote only one: "We can and we will prevent espionage, sabotage, or other actions endangering our national security. But we would betray our finest traditions if we attempted, *82 as this bill would attempt, to curb the simple expression of opinion. This we should never do, no matter how distasteful the opinion may be to the vast majority of our people. The course proposed by this bill would delight the Communists, for it would make a mockery of the Bill of Rights and of our claims to stand for freedom in the world." Congressional Record, Sept. 22, 1950, Vol. 96, No. 189, p. 15674.
The effect of the Act on our national security receives, among other references, the following, with respect to Section 22: "The changes which would be made in the present law by sections 22 and 25 * * * would add a number of new standards, which * * * would * * * seriously damage our national security."
We quote a further reference to Section 22: "This provision does not require an evil intent or purpose on the part of the alien, as does a similar provision in the Smith Act. Thus, the Attorney General would be required to deport any alien operating or connected with a well-stocked bookshop containing books on economics or politics written by supporters of the present government of Spain, of Yugoslavia or any one of a number of other countries. Section 25 would make the same aliens ineligible for citizenship. There should be no room in our laws for such hysterical provisions. The next logical step would be to `burn the books'."
A state paper from the Executive Department of the Government containing opinions of the character quoted, viewed as one may, reflects doubt as to constitutionality of a law under which that Department has now moved to imprison the petitioner. It would be a grave injustice to petitioner to be held in jail for weeks and months and then be released because the authority for her incarceration had been declared unconstitutional; that is, that the doubts of the Executive Department had been confirmed by the Judiciary.
If petitioner had been convicted of acts designed to overthrow the Government by force and violence under the Smith Act, 18 U.S.C.A. § 2385, under a recent ruling of the Supreme Court of the United States, Williamson v. U.S., 2 Cir., 184 F.2d 280, she would be entitled to bail pending appeal because of a question as to the constitutionality of the Smith Act  a question with no more authoritative foundation than the question raised to the Subversive Activities Control Act of 1950 by the President's veto message.
We conclude, on this record, in the absence of even an insinuation that petitioner's freedom on bail might jeopardize the security of this country, respondent Attorney General could not in the reasonable exercise of a discretion deny petitioner liberty on bail pending determination of her deportability under the laws of this country.

IV.
We do not pass upon the constitutional questions raised with regard to provisions of the 1950 Act governing deportation proceedings. No deportation proceedings have been conducted. If conducted they may result in petitioner's favor. Until the deportation proceedings have been concluded, whether petitioner by such proceedings has been deprived of her constitutional rights remains moot. See United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917; Impiriale v. Perkins, 62 App.D.C. 279, 66 F.2d 805; United States ex rel. Zdunic v. Uhl, 144 F.2d 286, holding that petitioner must first exhaust her administrative remedies before seeking review by a writ of habeas corpus based on a denial of rights in the administrative process.
Assume the character of attack on the constitutionality of the Act is, as petitioner claims, of such serious nature that this rule must give way to the more pressing necessity of considering elemental constitutional rights that are about to be placed in jeopardy under a law void because unconstitutional. We still are faced with the conclusion above announced on unreasonable exercise of discretion by the Attorney General. Hence a determination of the constitutional questions presented is not called for to dispose of the case. Under these circumstances we are advised by a higher court not to pass on the constitutional question. Arkansas Louisiana Gas Co. v. Department *83 of Public Utilities, 304 U.S. 61, 58 S.Ct. 770, 82 L.Ed. 1149.

V.
Under the law we are required summarily to hear and determine the facts in a case of this character and to dispose of the matter as law and justice require. It is our opinion that law and justice call for release of petitioner on bail during the pending deportation proceedings.