145 F.Supp. 569 (1956)
Antonia SENTNER, Plaintiff,
v.
Henry J. COLARELLI, Officer-in-Charge of the Immigration and Naturalization Service in the City of St. Louis, Missouri, Defendant.
No. 9440(1).
United States District Court E. D. Missouri, E. D.
October 4, 1956.
*570 *571 Sydney L. Berger, Evansville, Ind., R. L. Witherspoon, St. Louis, Mo., for plaintiff.
Harry Richards, U. S. Atty., and W. Francis Murrell, Asst. U. S. Atty., St. Louis, Mo., for defendant.
Before WOODROUGH, Circuit Judge, and MOORE and HARPER, District Judges.
MOORE, District Judge.
Plaintiff, an alien subject to a final order of deportation, brought this action against defendant, the Officer-in-Charge of the Immigration and Naturalization Service of the United States in St. Louis, to set aside, and enjoin the enforcement of, a certain "Order of Supervision" issued by defendant pursuant to Section 242(d) of the so-called McCarran-Walter Act (the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1252(d)). Since the complaint charged that Section 242(d), and the Order of Supervision, were unconstitutional, a three-judge court was convened.
Defendant has filed a motion to dismiss upon various grounds, and an answer. Plaintiff has filed a reply, and a motion for summary judgment. As it appears from the pleadings that no material fact is in issue, the matter will be disposed of upon these pleadings.
Plaintiff is a foreign born resident of the United States. She arrived in the United States on an immigrant visa and was admitted for permanent residence on July 26, 1914, when she was eight years old. She has been a resident of the United States for more than thirty-nine years and has lived continuously in the City of St. Louis, Missouri, for more than twenty-eight years. She was married in St. Louis on February 19, 1935, and she has lived in the same house in St. Louis since 1942, together with her husband and two minor children, all of whom are native-born citizens of the United States.
*572 In 1949, the government started deportation proceedings against plaintiff. Those proceedings culminated in an order of deportation on April 3, 1953. At one point during those proceedings the Attorney General sought to hold plaintiff without bail, but she was released by this court upon a writ of habeas corpus. Ex parte Sentner, D.C., 94 F.Supp. 77. Otherwise, plaintiff has at all times since 1949 been free on bond of $2000, which is still outstanding. She has at all times kept herself available for hearings, and has fully complied with all terms of the bond.
A little more than six months after the entry of the order of deportation, on October 9, 1953, defendant issued an "Order of Supervision", purporting to limit plaintiff's freedom in several respects, and pointing out that violation of the terms of such an order is a criminal offense, in violation of Section 242(d). Plaintiff thereupon brought this action to declare the order void, and a preliminary restraining order was issued.
During the pendency of this action, and shortly before the argument of this case, defendant modified the "Order of Supervision", and served the new order upon plaintiff. Neither party has taken the position that this new order renders the case moot, and neither has urged that the case be dismissed upon that ground. Nor should the case be dismissed as moot, for defendant should not be permitted to frustrate judicial review simply by issuing a new order from time to time. The complaint has been formally amended to seek review of "any orders" issued pursuant to Section 242(d). It is clear that the new order is now the basis of the controversy between the parties, and the oral argument has been directed in large measure toward the new order. Since the new order differs only slightly from to old one, the simplest way to dispose of the case is to regard the complaint as having been amended to seek review specifically of the new order. That order reads as follows:
 "United States Department of
 Justice Immigration and
 Naturalization Service
 "District File No. A-4579002
 "A.R. No. A-4579002
 "Date January 16, 1956
"Order of Supervision
"In the case of Antonia Sentner, whose deportation in accordance with law was ordered on April 3, 1953.
"Section 242(d) of the Immigration and Nationality Act provides:
"`Any alien, against whom a final order of deportation as defined in subsection (c) heretofore or hereafter issued has been outstanding for more than six months, shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General. Such regulations shall include provisions which will require any alien subject to supervision (1) to appear from time to time before an immigration officer for identification; (2) to submit, if necessary, to medical and psychiatric examination at the expense of the United States; (3) to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper; and (4) to conform to such reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case. Any alien who shall willfully fail to comply with such regulations, or willfully fail to appear or to give information or submit to medical or psychiatric examination if required, or knowingly give false information in relation to the requirements of such regulations, or knowingly violate a reasonable restriction imposed upon his conduct or activity, shall upon conviction be guilty of a felony, and *573 shall be fined not more than $1,000 or shall be imprisoned not more than one year, or both.'
"Therefore, it is hereby ordered that such alien shall be placed under supervision and permitted to be and to remain at large upon the following terms:
"(1) That said alien shall produce himself, at time and place designated, for deportation pursuant to the order of deportation.
"(2) That said alien shall upon request produce himself at a time and place designated for the purpose of submitting to medical and psychiatric examination and/or to furnish such information as may be deemed fit and proper.
"(3-a) That said alien shall notify the Officer in Charge of the Immigration and Naturalization Service at the address shown in (4) hereof of any change in residence or employment, within the immigration district, within 48 hours after change is made.
"(3-b) That said alien shall apply to the Officer in Charge of the Immigration and Naturalization Service at the address shown in (4) for permission to change place of residence from one immigration district to another, at least 48 hours prior to such change.
"(4) That said alien shall report in Person on the 9th day of each month at ____ (a. m.) (p. m.) to the Officer in Charge of the Immigration and Naturalization Service at Room 602, New Federal Building, 12th and Market Streets, St. Louis, Mo.
"(5) That said alien shall conduct herself in a lawful and orderly manner.
"(6) That said alien shall terminate and remain disassociated from, membership in, if any, support or other activity, if any, in or in furtherance of the doctrines and policies of, the Communist Party of the United States, the Communist Political Association, the Communist Party of any state, or of any foreign state, or of any political or geographical subdivision of any state, any section, subsidiary, branch, affiliate, or subdivision of any such group or organization.
"(7) That such alien shall refrain from `associating' with any person, knowing or having reasonable ground to believe that such person is a member of or affiliated with or is engaged in any promotion of any of the activities mentioned in subparagraph (6) above, provided that the term `associating' as used in this subparagraph shall not be construed to include members of such alien's family or professional legal counsel if such associations are not used in furtherance of the doctrines, policies, or activities of any of the organizations or activities mentioned in subparagraph (6).
"(8) That said alien shall not violate section 2385 of the `Smith' Act of June 25, 1948 (section 2385 of Title 18 U.S.Code) and Section 4 of the Internal Security Act of September 23, 1950 (section 783 of Title 50, U.S.C.A.).
"(9) That said alien shall upon request report in person for the purpose of giving information under oath to an immigration officer concerning her conduct, associations and activities.
"(10) That said alien shall not travel outside the State of Missouri without obtaining prior permission from the officer-in-charge, Immigration and Naturalization Service, St. Louis, Mo.
 "Henry Colarelli
 "St. Louis, Mo.
"(Officer in Charge, Immigration and Naturalization Service).
"I, Antonia Sentner, hereby acknowledge that I have read and understand the terms of this order, a copy of which I have received. I *574 further understand that failure to comply with the terms of this order or with any of the conditions of 242(d) of the Immigration and Nationality Act, will subject me to prosecution.
 ("Signature typed in, but
 alien did not sign)
_____________________________________
 Antonia Sentner (Alien's signature)
 5673 Cabanne Ave., St. Louis, Mo.
 "(Signed)
 "Ernest W. Rosenkoetter
 _______________________
 "Immigration Officer
 "Investigator
 "U. S. Immigration & Naturalization
 Service
 "St. Louis, Mo. (Address).
"I, _______ hereby acknowledge that I understand the terms set forth above and hereby agree to furnish a written report ______ each month to the Officer in Charge concerning the alien's name, registration number, current address, place of employment, associates, and organizational activities, and that I will immediately report any failure on the part of the alien to comply with the terms of the order or information coming to my attention which might indicate that the alien intends to abscond or otherwise violate this order.
St. Louis, Missouri; January 16, 1956:
"I hereby certify that the above Form I-220-B was read to the subject, Antonia Sentner, in its entirety this date by Investigator Ernest W. Rosenkoetter, and that the subject thereupon refused to sign her name in the space provided therefor.
(Signed) Norman M. Magee,
Investigator
U. S. Immigration &
 Naturalization Serv.
 (Signed) William H. Phillips,
 Investigator
 U. S. Immigration &
 Naturalization Serv."

I. The order is reviewable in this court, at least in part.
The order is in general subject to judicial review in a proceeding of this sort. Nukk v. Shaughnessy, 350 U.S. 869, 76 S.Ct. 114. Cf. Shaughnessy v. Pedreiro, 349 U.S. 48, 50-52, 75 S.Ct. 591, 99 L.Ed. 868.
As will appear below, some parts of this order do not now present a justiciable controversy, and to the extent that this action seeks review of those parts the action will be dismissed. However, some parts of the order clearly create duties immediately enforceable by criminal prosecution, and are therefore reviewable at this time. Cf. Frankfurter, J., concurring, in Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. 123, at page 156 note 6, 71 S.Ct. 624, 95 L.Ed. 817. The issue of justiciability has been settled by the recent decision of the Supreme Court in Nukk v. Shaughnessy, 350 U.S. 869, 76 S.Ct. 114. That case involved an order quite similar to the order presented in this case; the Supreme Court reversed the District Court's dismissal and remanded the case for "consideration on the merits", citing Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.
The order being reviewable, this court has jurisdiction of the action by virtue of 8 U.S.C.A. § 1329.

II. Neither the Attorney General nor the Commissioner of Immigration is an indispensable party to this action.
A principal ground of the motion to dismiss is that plaintiff has failed to join an indispensable party, although it is not entirely clear whether the indispensable party is alleged to be the Attorney General or the Commissioner of Immigration. In support of this contention defendant relies upon, inter alia, De Pinho Vaz v. Shaughnessy, 2 Cir., 208 F.2d 70. The contention is without merit.
Where the applicable regulations delegate to the District Director, or the local Officer-in-Charge, the authority to *575 promulgate orders, and to make those orders final, he is the only necessary party in a proceeding to review those orders. Shaughnessy v. Pedreiro, 349 U.S. 48, 52-53, 75 S.Ct. 591. That is the case here. See 8 Code Fed.Regs., Section 242.3(c) (1). The rule is not only settled but sound, for there appears to be no reason why plaintiff should go all the way to the District of Columbia to obtain judicial review of this order. If there were any doubt about the applicability of this principle to this case, one may infer that the doubt has been removed by the reversal of Nukk v. Shaughnessy, supra.

III. A violation of the order of supervision will not bring about detention of plaintiff without a jury trial.
Plaintiff apparently assumes, from reading the order of supervision, that a violation of the order of supervision could subject her not only to criminal prosecution but also to being picked up by the Attorney General and detained without a jury trial, somewhat in the manner of a revocation of parole. The order does indeed appear to contemplate such action. Plaintiff argues vigorously that such a procedure would deny her a jury trial guaranteed by the Constitution.
The power of the Attorney General, however, is derived from the statute, not from the order. The statute does not authorize detention of a deportable alien for more than six months after the order of deportation becomes final, except perhaps under unusual circumstances. Cf. United States ex rel. Cefalu v. Shaughnessy, D.C., 117 F.Supp. 473, affirmed on authority of opinion below, 2 Cir., 209 F.2d 959. After expiration of the six-month period, the only section of the statute that gives the Attorney General any power over the alien  other than the power to deport  is Section 242(d), and that section authorizes only supervision, not detention. Even if plaintiff should violate the terms of a valid order of supervision, therefore, the Attorney General could not "revoke" this "parole" and further detain plaintiff. Shrode v. Rowoldt, 8 Cir., 213 F.2d 810; United States ex rel. Daniman v. Shaughnessy, 2 Cir., 210 F.2d 564; United States ex rel. Blankenstein v. Shaughnessy, D.C. S.D.N.Y., 117 F.Supp. 699, 704. All that the Attorney General could do in that event would be to institute criminal prosecution for violation of the terms of the order, under Section 242(d), and in such a criminal prosecution there would of course be a right to trial by jury. This aspect of the case may therefore be put to one side.

IV. Paragraphs 5 and 8 of the order exceed the authority delegated by Congress to the Attorney General.
Paragraphs 5 and 8 of the order are quoted in full above. Briefly, paragraph 8 orders plaintiff to refrain from violating certain provisions of the Smith Act or the Internal Security Act. Paragraph 5 orders her to conduct herself "in a lawful and orderly manner."
At first glance it is not entirely clear what is meant by the word "orderly" in Paragraph 5. Common sense suggests, however, that this word derives content from the traditional law of disorderly conduct. Since such an interpretation would go far toward answering the argument that paragraph 5 is unconstitutionally vague, it may be assumed that the word carries some such meaning. Cf. Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919.
So construed, these paragraphs accomplish nothing more than adding to the penalties already imposed on conduct which is already criminal. The government, of course, has an interest in discouraging plaintiff from violating the Smith Act or Internal Security Act, but Congress has taken care to protect that interest in its own way, by establishing criminal penalties in the Smith Act itself. This Court is now asked to infer that in 1952 Congress was dissatisfied with these penalties, as they apply to deportable aliens but not to other persons, and that Congress therefore delegated to the Attorney General the power to delegate to the local Officer-in-Charge the power to *576 decide whether, in the case of any individual deportable alien, it would be wise to promulgate an order which adds another count to any possible indictment for violation of these laws, and adds slightly to the maximum penalty in the event of conviction. Surely this would be a most extraordinary sort of action for Congress to choose, and this court has not been directed to any evidence that any such purpose underlay the enactment of Section 242(d). While Section 242(d) does authorize "reasonable written restrictions" upon the alien's conduct, it is hardly conceivable that Congress sought to authorize the Attorney General, through his subordinates, to duplicate criminal provisions already on the statute books. A paragraph, such as paragraph 8, which accomplishes no more than that, is outside the authority conferred by Congress.
Paragraph 5, as construed above, appears to duplicate state or local regulations of disorderly conduct, rather than federal criminal provisions. Assuming that Congress has the constitutional power to regulate the disorderly conduct of deportable aliens, although disorderly conduct has generally been considered to be a matter of local rather than national concern, no evidence has been produced to indicate that Congress has in fact considered such disorderly conduct to be a substantial federal problem, or that Congress had any reason to take such an extraordinary step to meet such a problem. In the absence of such evidence, the statute cannot reasonably be construed to authorize this sort of restriction. Paragraph 5, therefore, is also outside the authority conferred by Congress.
Aside from these observations, the statute as construed below does not authorize the restrictions of paragraphs 5 and 8, for they would in no way aid the Attorney General to assure himself that plaintiff will be readily available for deportation.

V. Paragraphs 6 and 7 are invalid.
Paragraphs 6 and 7 are quoted in full above. Briefly and inadequately summarized, they seek to prevent plaintiff from association with, or support of, the doctrines and policies of the Communist Party, or any affiliate thereof, and from association with any person who plaintiff has reasonable ground to believe is affiliated with, or promoting, such activities. The new order contains a proviso that plaintiff may lawfully associate with her family or lawyer if such associations are not used in furtherance of such doctrines, policies, or activities. These paragraphs are invalid because they exceed the authority delegated by Congress, and because, even if these paragraphs were authorized, the pleadings establish an abuse of discretion on the part of defendant.

A. Paragraphs 6 and 7 exceed the authority delegated by Congress.
Section 242(d) subjects the alien awaiting deportation (more than six months after the order of deportation has become final) to supervision by the Attorney General under regulations to be prescribed by the Attorney General, such regulations to be of the following types: (1) to appear for identification from time to time; (2) to submit to physical and mental examinations; (3) to give information under oath as to his nationality, circumstances, habits, associations, activities, and other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper; and (4) "to conform to such reasonable written restrictions on his conduct or activities as are prescribed" by the Attorney General in his case.
Paragraphs 6 and 7 clearly are not authorized by the first three parts of this section, and can be sustained, if at all, only as "reasonable written restrictions" under part (4). The inquiry must be directed, then, to the meaning of the phrase "reasonable written restrictions" as used in this section of the statute.
It is a familiar principle, both of common sense and of statutory construction, that a catch-all phrase of this sort must be read in the context of the general purpose of the statute, and particularly *577 of the preceding clauses. That is to say, part (4) of Section 242(d) cannot be taken to authorize any reasonable written restriction whatever, but only reasonable written restrictions calculated to assist the Attorney General in carrying out his powers and duties under the statute, and more specifically only reasonable written restrictions of the same sort  ejusdem generis  as those authorized in the first three parts of Section 242(d).
After the expiration of the six-month period, as pointed out above, the Attorney General retains only two powers with respect to the alien: to deport her, and to supervise her. Supervision, of course, is not an end in itself; the power to supervise could be conferred only as an auxiliary to the other power. The supervision authorized, then, is supervision designed to aid the Attorney General in carrying out his duty to deport the alien, that is, in assuring that the alien will be available for deportation. See the opinion of Judge Sullivan, in United States v. Witkovich, D.C.N.D. Ill., 140 F.Supp. 815, appeal pending, No. 295, 1956 Term.
The restrictions authorized by parts (1) and (2) of Section 242(d) are clearly directed solely toward that purpose. While parts (3) and (4) are not so clearly limited by their own terms, they are entirely consistent with such an interpretation, and must be so construed. Part (4), then, authorizes "reasonable written restrictions" designed to aid the Attorney General in assuring that the alien will be available for deportation, but not other restrictions designed to achieve some other objective. Paragraphs 6 and 7, restricting plaintiff's associations, would not assist the Attorney General at all in this respect, and therefore are not of the sort authorized. United States v. Witkovich, supra.
Beyond the terms of the Immigration and Nationality Act of 1952, evidence of the legislative purpose may be found in other statutes bearing on the same subject. It is well known that Congress has enacted many statutes in the field of subversive activities. It seems hardly likely that Congress, by the general language of Section 242(d), has authorized the Attorney General to add to these regulations any new restrictions he might desire, applying to individual deportable aliens. When Congress sought to confer upon the Attorney General the power to detain aliens without bail, on the ground that their freedom might be harmful to the national security, Congress set forth this power specifically. Section 242(a). See Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547. If Congress were to confer any further power to regulate subversive or potentially subversive activities of deportable aliens, one would hardly expect the power to be conferred by general language of this sort. On the contrary, the record of Congressional regulation in this area indicates that Congress considers itself competent to regulate such activities, and considers that it has already dealt with such activities in a satisfactory manner.
Even if the statute were construed to authorize "reasonable written restrictions" directed toward such activities, however, the restrictions of paragraphs 6 and 7 cannot be said to be reasonable. Surely one element of reasonableness is that the restrictions be fairly specific, so that the alien may know what activities are prohibited; paragraphs 6 and 7 are unreasonably vague. Under these paragraphs, criminal penalties would turn on the words "activity * * * in furtherance of the doctrines and policies of" the Communist Party or any affiliate thereof. Yet these doctrines and policies change frequently, and even the experts frequently cannot agree on what those doctrines and policies are. It seems hardly fair to hold plaintiff to a higher degree of expertise than our political analysts possess, and then rely upon a jury to meet the same level of expertise; yet that is the effect of these paragraphs.
The vagueness of these restrictions can be illustrated by a few examples. Thus, it has often been suggested that the Communists desire to take advantage of racial *578 problems in this country by advocating integration in the south, thereby supposedly stimulating unrest and discord. If that is true, is such advocacy a "doctrine" or "policy" of the sort contemplated by paragraphs 6 and 7? It is hardly reasonable to suppose that the Attorney General, by these two paragraphs, seeks to preclude plaintiff from expressing approval of the decision of the Supreme Court in the School Segregation Cases (Brown v. Board of Education), 347 U.S. 483, 76 S.Ct. 686, 98 L.Ed. 873, or of the position taken by this same Attorney General in those cases. Yet such an expression would appear to be activity in furtherance of that "policy". If those paragraphs do not have this effect, it is not easy to say what their meaning is.
Or it may be assumed that it is a policy of the Communist Party to bring about the reversal, on appeal, of the conviction of plaintiff's husband under the Smith Act. If so, apparently a word of encouragement from plaintiff to her husband would be activity in furtherance of that policy, and therefore a violation of paragraph 6. Yet it seems hardly likely that the Attorney General, or his subordinate, the defendant, intended to make such encouragement a criminal act.
Surely the defendant could have spelled out more specifically what, if anything, he had in mind when these two paragraphs were prepared. Putting aside the vagueness of some of the other language of these two paragraphs, restrictions as vague as these cannot meet the standards of definiteness prescribed by Congress in authorizing "reasonable written restrictions".
Finally, it is in order to recall that the Supreme Court has admonished, time and time again, that when a serious question of constitutionality is raised the courts should construe the statute to avoid that question, if such a construction is reasonably possible. E. g., Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598. Serious constitutional questions would certainly be raised by paragraphs 6 and 7 of this order of supervision, if they had been authorized by Congress. For example, administrative regulations, and especially those bearing criminal penalties, are subject to the same requirements of definiteness as are statutes. M. Kraus & Bros. v. United States, 1946, 327 U.S. 614, 621, 66 S.Ct. 705, 90 L.Ed. 894; Boyce Motor Lines v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367. Thus, the Attorney General is required not only by the statute but also by the Constitution to give the alien fair notice of the conduct which is prescribed by the regulations promulgated under Section 242(d). The vagueness of paragraphs 6 and 7 has already been pointed out above; this vagueness would raise a substantial constitutional question, if the statute were construed to authorize these paragraphs.
Nor would Section 242(d) itself be free from serious attack on the ground of vagueness, if that section were construed to authorize paragraphs 6 and 7. For if the Attorney General's discretion in promulgating supervisory restrictions is not limited to restrictions designed to aid him in the performance of the only power remaining to him  the power to deport the alien  there does not appear to be any limitation at all. Some limitation must be found in the Act, if the delegation is not to run afoul of the principle of separation of powers, Cf. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, but none appears.
Problems of vagueness are not the only constitutional issues which would arise if the statute were construed to authorize paragraphs 6 and 7 of the order, for the limitations which those paragraphs impose on plaintiff's freedom of speech and association appear to collide head on with the First Amendment. Moreover, the ad hoc nature of these restrictions, applying only to a specific named individual, would appear to raise substantial questions under the due process and bill of attainder clauses of the Constitution, Amend. 5 and Const. art. 1, § 9, cl. 3.
*579 All of these constitutional questions can be avoided by the interpretation of the statute set forth above. Even if that interpretation were only one of several possible interpretations, therefore, rather than the only reasonable interpretation apparent, it would be the duty of this court to adopt that interpretation.

B. Even if paragraphs 6 and 7 were authorized by Congress, the pleadings show that defendant has abused his discretion in this case.
If the Attorney General has any discretion to limit plaintiff's associations, as he has sought to do in paragraphs 6 and 7, that discretion must be exercised according to some standard. As indicated above, no standard has been found in the statute, but it might be well to assume for a moment that more discerning eyes would find such a standard. It might be suggested, for example, that the Attorney General has been authorized to prescribe any reasonable written regulation calculated to protect the security of the nation, a standard more or less similar to the standard guiding the exercise of his discretion to detain without bail under Section 242(a). See Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547; Ex parte Sentner, D.C., 94 F.Supp. 77.
Such a discretion would appear to be a highly personal and individual discretion, and it may well be that Congress would never have intended such a discretion to be delegated to the local District Director or Officer-in-Charge, notwithstanding the general language of 8 U.S.C.A. § 1103. Cf. Black, J., dissenting in Carlson v. Landon, 342 U.S. 524, at pages 553-554, 72 S.Ct. 525, at pages 540-541. However, it may be further assumed, with reservations, that such a discretion was properly delegated in this instance.
On these assumptions, the facts established by the pleadings in this case show a clear abuse of discretion on the part of defendant. The pleadings show that plaintiff has resided in the United States for more than thirty-nine years, and has lived continuously in St. Louis for more than twenty-eight years; that she was married in St. Louis twenty-one years ago, and has lived in the same house, with her husband and two minor children (all native-born citizens of the United States) since 1942. Nothing in these facts suggests that the security of the United States would be endangered if plaintiff were permitted to associate with Communists, or to carry on some activity in furtherance of some policy of the Communist Party, nor does any of these facts suggest any other reason for the exercise of discretion in this case.
Defendant's answer, in fact, does not allege any facts at all which might tend to explain the exercise of discretion in this case. Whatever may be the standard of discretion, it was incumbent on defendant to put forth some sort of explanation. Ex parte Sentner, D.C., 94 F.Supp. 77. Cf. Carlson v. Landon, 342 U.S. 524, at pages 529-531, 532, 72 S.Ct. 525, at pages 528-529, 530.

VI. Paragraphs 1, 2 and 9 present no justiciable controversy at this time.
Paragraphs 1, 2 and 9 are quoted in full above. Briefly, paragraph 1 requires that plaintiff produce herself for deportation, if and when she is ordered to do so. The pleadings indicate that she has not been ordered to do so, in the three years or more which have elapsed since entry of the order of deportation. It appears quite possible that she will never be ordered to do so. The requirement of Paragraph 1 is nothing more than an announcement that at some indefinite time in the future defendant may decide to issue an order which would impose immediate duties upon plaintiff. Such an indefinite matter presents no controversy justiciable at this time in this court. Cf. Frankfurter, J., concurring, in Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. 123, at page 155, 71 S.Ct. 624. If and when such an order is promulgated, the validity of that order may be reviewed. So far as the complaint *580 seeks review of paragraph 1, the complaint should be dismissed.
Similarly, paragraph 2 of the order requires that plaintiff, upon request, appear for medical and psychiatric examinations, or to furnish information requested. The pleadings do not allege that any such request has ever been made, nor is there any allegation that defendant is about to make such a request. In the absence of such allegations, no justiciable controversy is presented here.
Likewise, paragraph 9 requires that, upon request, plaintiff report to give information requested. The foregoing observations respecting paragraph 2 are equally applicable to paragraph 9.

VII. Paragraphs 3a, 3b, 4, and 10 do not exceed the authority conferred upon the Attorney General by Section 242(d).
Paragraphs 3a, 3b, 4 and 10 are quoted in full above. Briefly, paragraph 3a requires that plaintiff notify defendant of any change of residence or employment, within the immigration district, within 48 hours after the change is made. The kind of information demanded by this paragraph is the kind of information concerning plaintiff's activities which is clearly calculated to aid the Attorney General in supervising plaintiff to assure that she will be readily available for deportation whenever deportation should become possible. The requirement that plaintiff furnish such information is therefore authorized by Section 242(d), as construed above. Cf. United States v. Witkovich, supra.
Paragraph 3b requires that plaintiff "shall apply to * * * (defendant) * * * for permission to change place of residence from one immigration district to another, at least 48 hours prior to such change." The order does not state whether defendant seeks to reserve to himself the power to withhold such "permission", or whether such "permission" would be granted automatically. If the former interpretation is the proper one, it is not entirely clear that the validity of this paragraph is now justiciable, for there is no allegation that defendant has withheld permission, or is likely to withhold such permission, nor is there any allegation of the reasons which he would advance to justify such withholding. Passing the constitutional question of justiciability, such an interpretation would present a further constitutional question of infringement of a resident alien's right to travel. Cf. Crandall v. Nevada, 6 Wall. 35, 18 L.Ed. 744; Shachtman v. Dulles, 96 U.S.App.D.C. 287, 225 F.2d 938, 941. And of course such an interpretation would raise an immediate question whether this requirement exceeds the authority delegated by Congress in Section 242(d), for there appears to be no reason why the Attorney General could not supervise plaintiff as well in one immigration district as in another.
All of these questions should be avoided, as noted above, if it is reasonably possible to construe the order in such a way as to avoid them. Such a construction not only appears to be reasonably available, but in fact is clearly called for by the language of paragraph 3b. That paragraph does not require that plaintiff must remain in the district until "permission" has been obtained, and this court will not interpolate such a questionable requirement. The paragraph merely requires that plaintiff remain in the district for 48 hours after notifying defendant of her intention to change her residence to another district, although the notification is termed an application for permission. Presumably this requirement is designed to give the officer in charge in this district a reasonable opportunity to notify the officer in charge in the district to which plaintiff proposes to move, so that the latter officer can prepare to supervise her on her arrival. Such a requirement would be reasonably calculated to aid the Attorney General in supervising plaintiff to assure that she will be readily available for deportation, *581 and is therefore the kind of requirement authorized by part (3) of Section 242(d).
Even on this interpretation of paragraph 3b there may be some question of justiciability, for plaintiff does not allege that she has any intention of changing her residence to another district. Nevertheless, paragraph 3b does impose a 48-hour limitation on plaintiff's freedom of movement; if plaintiff were required to wait until she had decided to move on the spur of the moment, before contesting the validity of this limitation, even a favorable decision of this court would be delivered much too late to afford her any relief. The court is satisfied, therefore, that the complaint does present a justiciable controversy as to paragraph 3b, and that that paragraph, as construed above, is authorized by the statute.
Paragraph 4 requires that plaintiff shall report in person to defendant in the Federal Building in St. Louis on the ninth day of each month. Such a requirement seems reasonably calculated to aid defendant in assuring himself that plaintiff is in fact still available for deportation, and is therefore the kind of restriction authorized by part 1 of Section 242(d).
Paragraph 10 requires that plaintiff "shall not travel outside the State of Missouri without obtaining prior permission from" defendant. If this paragraph means what it says, it would raise serious questions of constitutionality and statutory construction, as indicated above in the comments directed toward paragraph 3b. Yet it seems inconceivable that defendant, in adding this typewritten provision to the regular printed form, really intended with forethought to impose such a restriction. As noted above, when the alien desires to make a permanent change of residence to another district, paragraph 3b of the printed form does not require that she first obtain permission, but merely requires that she give 48 hours notice. It is hardly reasonable to suppose that, when confronted with the much less serious problem of a temporary visit outside the State, perhaps still within the district, defendant would demand not only prior notice but also the right to withhold permission for the trip. The inference drawn from a careful reading of the order as a whole is that paragraph 10 was inserted to supplement paragraph 3b, and that it was rather carelessly drafted without full attention to the precise import of paragraph 3b. It follows that paragraph 10, notwithstanding the language carelessly included therein, requires nothing more than prior notice for travel outside the state. This interpretation not only makes a consistent, meaningful whole of the entire order, but also avoids the constitutional problems noted above, in accordance with the oft-repeated directions of the Supreme Court. And as interpreted, paragraph 10, like paragraph 3b, would constitute the sort of restriction clearly authorized by Section 242(d).

VIII. Paragraphs 3a, 3b, 4, and 10, as interpreted, do not infringe any constitutional provision.
As has been noted above, many of the constitutional questions presented by plaintiff have been eliminated from the case, on a close examination of the precise meaning of the authorizing statute and the order of supervision. The only valid paragraphs of that order which are now ripe for review are paragraphs 3a, 3b, 4 and 10. There remain for consideration certain minor constitutional arguments directed toward those paragraphs, as interpreted.
Certainly these paragraphs do limit plaintiff's freedom somewhat. She must notify defendant of any change of residence or employment within the district within 48 hours after making the change. She must give 48 hours prior notice to change her residence to another district. She must give prior notice to travel outside the state. And apparently she cannot plan anything that will occupy her entire day on the ninth day of each month, because she must be careful to appear at defendant's office at some time during the day.
*582 These restrictions, and particularly the last one, are somewhat cumbersome. Clearly they constitute deprivations of "liberty" as that word is used in the Fifth Amendment. But they are not deprivations of liberty without due process if they are reasonably calculated to achieve a legitimate governmental purpose, without imposing an unduly heavy burden on plaintiff. Assuming the validity of the deportation order against plaintiff (and that must be assumed, for it is not subject to collateral attack in this proceeding), it is a legitimate objective for defendant to seek to assure himself that plaintiff will be readily available for deportation when deportation becomes possible. And all four of these restrictions, as already noted, are reasonably designed to further that objective. Of these four, only the requirement of personal appearance on the ninth day of each month imposes any substantial burden. The other three clearly do not deprive plaintiff of her liberty without due process of law.
The requirement of regular personal appearance, however, might become quite burdensome. Circumstances might make it necessary or highly desirable for her to be out of town on the ninth day of some month, especially if she were a businesswoman rather than a housewife. Or circumstances might make it necessary or highly desirable for her to be occupied at some place other than defendant's office throughout the ninth day of each month. If she were subject to conviction of a felony for failing to appear on such a day, the restriction imposed by paragraph 4 would seem to be a good deal more severe than is necessary; defendant could adequately assure himself of plaintiff's continued presence in the district if this restriction carried a little flexibility with respect to the date of appearance.
On the other hand, to strike down the entire restriction for this reason would penalize defendant's draftsmanship with undue severity. Surely defendant should be expected to take a reasonable view of the matter, and interpret this requirement with a reasonable degree of flexibility. If plaintiff should move permanently to another district, giving appropriate notice, no one would expect her to appear in defendant's office on the ninth day of the following month. If she should be taking a trip outside the state, after giving appropriate notice, on the ninth day of some month, no one would expect her to appear at defendant's office on that day. And if she should appear on some day other than the ninth, in the early part of the month, explaining that it will be impossible to appear on the ninth, no reasonable person would demand more. All that defendant could have intended to require by paragraph 4 is that plaintiff should appear on or about the ninth day of each month, unless she has, and communicates to him, some good reason not to appear. This court will not interpret that paragraph to require any more than that.
Thus interpreted, paragraph 4 imposes on plaintiff the burden of coming downtown to put in an appearance from time to time. The burden is not a substantial one, and is not easily avoidable. It follows that this restriction does not deprive plaintiff of liberty without due process of law.
All of the other constitutional objections interposed by plaintiff to these restrictions have been disposed of by interpretation of the statute and the order.

IX. Section 242(d), as construed, is constitutional.
There remains only the charge that the underlying statute itself is unconstitutional. Most of the constitutional objections raised, particularly those based on the First Amendment, have been avoided by construing the statute to authorize only restrictions designed to aid the Attorney General in assuring that the alien will be readily available for deportation, and not restrictions upon the alien's speech or associations, or other restrictions not designed to further this purpose.
*583 That interpretation also disposes of the charge that the statute is unconstitutionally vague, in failing to guide the Attorney General in exercising his discretion to impose restrictions upon the alien. As interpreted, the statute does furnish him a guide: he is authorized to impose restrictions which will aid him in carrying out the duty to make sure that the alien will be readily available for deportation, and no other restrictions. With this limitation, which is implicit in the legislation, it cannot seriously be urged that the statute delegates to the Attorney General an unduly broad or vague power.

X. Summary.
1. Paragraphs 1, 2, and 9 of the order of supervision present no justiciable controversy at this time. So far as the complaint seeks review of these paragraphs, the complaint should be dismissed, and defendant's motion to dismiss will be sustained to that extent. The motion will be overruled in all other respects.
2. Paragraphs 5, 6, 7, and 8 exceed the authority delegated to the Attorney General by Congress, and should be stricken from the order. As to these paragraphs, plaintiff's motion for a summary judgment should be sustained, and these paragraphs should be declared invalid and unenforceable; defendant should be enjoined from enforcing these paragraphs. The motion for summary judgment should be overruled in all other respects.
3. That part of Section 242(d), as construed in this opinion, which authorizes the Attorney General to make an order of supervision, is valid and constitutional; paragraphs 3a, 3b, 4, and 10 of the order, as interpreted above, are valid and enforceable; the order of supervision, as it remains after striking paragraphs 5, 6, 7, and 8, is not invalid on its face, and so much of it as is valid may be enforced; and a declaratory judgment to this effect will be entered.