NATIONAL CENTER FOR IMMI-
GRANTS' RIGHTS, INC.; American
Friends Service Committee; El Rescate
("The Rescue"); United Automobile,
Aerospace and Agricultural Implement
Workers of America, AFL–CIO, Local
645; Central American Refugee Center
(Carecen); El Concilio Manzo; Wil-
lamette Valley Immigration Project,
Plaintiffs–Appellees,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE; Alan Nelson, Com-
missioner of the Immigration and Nat-
uralization Service, Defendants–Appel-
lants.

No. 88–5774.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 19, 1989.

Decided Sept. 7, 1990.

John F. Daly, Civ. Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Peter A. Schey, Nat. Center for Human Rights and Constitutional Law, Los Angeles, Cal., for plaintiffs-appellees.

Steven M. Schneebaum, Patton, Boogs and Blow; D. Lea Browning, Intern. Human Rights Law Group, Washington, D.C., for amicus.

Before FERGUSON, REINHARDT and TROTT, Circuit Judges.

FERGUSON, Circuit Judge:

This appeal concerns regulations promulgated in 1983 by the Immigration and Naturalization Service (INS), which imposed a condition against employment in appearance and delivery bonds of aliens awaiting deportation hearings. This is the third appeal to this court regarding this matter. Our earlier opinions, 743 F.2d 1365 (9th Cir.1984), 791 F.2d 1351 (9th Cir.1986) were vacated and remanded for further consideration in light of the Immigration Reform and Control Act of 1986 (IRCA). 481 U.S. 1009 (1987). On remand, the district court reiterated its earlier holding that the regulations were not authorized by the statute, and further held that the Attorney General's power to impose the blanket bond condition had not been modified or increased by the Immigration Reform and Control Act of 1986. The Immigration and Naturalization Service appeals the district court's grant of summary judgment in favor of the National Center for Immigrants' Rights, Inc. and other plaintiffs. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1983, the INS promulgated regulations which stated in part: "[a] condition against employment shall be included in an appearance and delivery bond in connection with a deportation proceeding...." 8 C.F.R. 103.6(a)(2)(ii) (1988). The previous regulations had provided that, in his discretion and with the prior approval of the INS Regional Commissioner, the District Director could include a condition barring "unauthorized employment" in individual appearance and delivery bonds based on consideration of many factors; a non-exclusive list of nine factors was included in the regulation. 8 C.F.R. § 103.6(a)(2)(ii), (3)(iii) (1983).

One day before the regulations went into effect, an injunction was sought by the National Center for Immigrants Rights and a group of other nonprofit organizations, a local affiliate of the United Auto Workers Union, and individuals in deportation proceedings ("NCIR"). Ten days later, after hearing evidence and testimony, the district court granted a preliminary injunction against enforcement of the regulation. The INS appealed to this court, challenging the jurisdiction of the district court, the grant of the preliminary injunction, and the failure to certify a class. *National Center for Immigrants Rights v. I.N.S.*, 743 F.2d 1365 (9th Cir.1984). We held that the district court had jurisdiction and affirmed the injunction, but we remanded for class certification. *Id.*

On remand, the district court certified a class of "all those persons who have been or may in the future be denied the right to work pursuant to 8 C.F.R. § 103.6." The

INS moved for summary judgment, stating that no issue of material fact existed and that they were entitled to judgment as a matter of law. The district court granted summary judgment in favor of the NCIR, holding the regulations invalid because the discretion granted to the Attorney General under the Immigration and Naturalization Act must be limited to those conditions which are related to securing the alien's presence at future deportation hearings. *National Center for Immigrants' Rights v. I.N.S.*, 644 F.Supp. 5 (C.D.Cal.1985). The Attorney General's discretion could not extend to the blanket imposition of a no-work condition on all aliens released on bond pending future deportation proceedings. *Id.* at 11.

The INS appealed, again challenging jurisdiction and arguing that the Attorney General had statutory authority to impose any condition in a bond that he deemed necessary to carry out the provisions of the act. *National Center for Immigrants' Rights v. I.N.S.*, 791 F.2d 1351 (9th Cir. 1986). We again upheld jurisdiction, *id.* at 1353–54, and affirmed the summary judgment, *id.* at 1354–56. The INS sought certiorari. In 1986, Congress enacted the Immigration Reform and Control Act (IRCA). 8 U.S.C. § 1324a et seq. The Supreme Court granted certiorari, vacated the judgment, and remanded for further consideration in light of IRCA. 481 U.S. 1009 (1987). We remanded to the district court for this consideration. 818 F.2d 869 (9th Cir.1987).

The district court requested additional briefing from the parties on the effect of IRCA on the condition imposed by the regulation. The court found that, although IRCA was concerned with the impact of the employment of undocumented workers on the American workforce, IRCA had not conferred upon the Attorney General the

authority to impose a blanket no-work rider on appearance and delivery bonds. Incorporating portions of the analysis from its earlier opinion, the court again granted summary judgment in favor of the plaintiffs. The INS timely appealed the district court's reaffirmance of summary judgment.

## JURISDICTION

■ The INS again challenges the jurisdiction of the district court, reasserting its position that review is only available on habeas corpus under 8 U.S.C. § 1252(a)(1).[1] As we held previously, § 1252(a)(1) deals only with complaints about delays in determining deportability in individual cases. In *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1032–33 (11th Cir.1982), *disapproved on other grounds, Jean v. Nelson*, 727 F.2d 957, 976 n. 27 (11th Cir.1984) (en banc), the court distinguished between jurisdiction to rule on the merits of an individual deportation order and jurisdiction to rule on a pattern and practice of constitutional violations. *See also Flores v. Meese*, 913 F.2d 1315, 1318–1319 (9th Cir.1990); *Salehi v. District Director, I.N.S.*, 796 F.2d 1286, 1290 (10th Cir.1986); *Jean v. Nelson*, 727 F.2d at 979–981 (statutory as well as constitutional questions), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (expressing no view on jurisdictional issues); *cf. Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325 (D.C.Cir.1989) (no jurisdiction in district court for review of legalization decisions under IRCA). The district court had jurisdiction since NCIR challenged the blanket provision on constitutional and statutory grounds and did not seek a review on the merits of any individual determination regarding release on bond.[2]

---

**1.** The statutory provision states in part:

Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or parole pending final decision of deportability upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circum-

stances in the case of any alien to determine deportability.
8 U.S.C. § 1252(a)(1).

**2.** During this appeal, the NCIR also raised a "suggestion of lack of jurisdiction," relying on *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), which we rejected, 892 F.2d 814 (9th Cir.1989). The notice of appeal gave sufficient notice that all of

## STANDARD OF REVIEW

Our prior judgments in this case were vacated when the Supreme Court remanded for consideration in light of IRCA. The district court incorporated portions of its earlier order by reference, considered the impact of IRCA, and reaffirmed its grant of summary judgment. When summary judgment is granted to the nonmoving party, the question is whether the moving party had an opportunity to fully and fairly litigate the issues. *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982). Here, the district court received evidence and heard testimony. The INS twice sought a decision on the merits of this issue, first in our initial review of the preliminary injunction, 743 F.2d at 1369, and then with its motion for summary judgment in the district court, 644 F.Supp. at 6. On remand, when providing additional briefing on IRCA, the INS raised no suggestion that any additional litigation was needed. We review the grant of summary judgment de novo, *Kruso v. International Telephone & Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), to determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir. 1989).

## I. THE IMPACT OF THE REGULATION

The challenged regulation states that a "condition *barring employment shall be* included in an appearance and delivery bond in connection with a deportation proceeding...." 8 C.F.R. § 103.6(a)(2)(ii) (1990) (emphasis added). During this litigation, basic questions concerning the nature, scope, and impact of the regulation have been subject to debate: (a) whether the condition bars "employment" or only "unauthorized employment"; (b) whether it applies only to those who are unauthorized to work in any event; (c) whether it implicates only work or also freedom from detention; and (d) whether it is a "blanket

the defendants sought to appeal. 892 F.2d at

condition" or affords individualized determinations which merely shift the burden of proof regarding work authorization. We examine each of these in turn before turning to our analysis of the statutory authority for the regulations.

## A. "EMPLOYMENT" OR "UNAUTHORIZED EMPLOYMENT"

The INS asserts that the regulation only bars "unauthorized employment." The INS has used both terms—"employment" and "unauthorized employment"—at different times, though not quite interchangeably. In the text of the regulation and when put into operation on the face of the bonds, the condition refers broadly to "employment."

The text of the subsection describes a "condition *against employment.*" 8 C.F.R. § 103.6(a)(2)(ii) (emphasis added). The caption appearing above this provision is more limited: "Condition against *unauthorized* employment" (emphasis added). The meaning lies in the text of the regulation. "[T]he heading of a section cannot limit the plain meaning of the text." *Railroad Trainmen v. B. & O.R. Co.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947) (statutory interpretation). *See also Nordby Supply Co. v. United States*, 572 F.2d 1377, 1378 (9th Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 182, 58 L.Ed.2d 170 (1978).

The discrepancy could be accidental, but a comparison with the previous regulation shows that the use of the term "employment" is deliberate. The previous regulation, which had the same caption, read: "In the discretion of the district director and with the prior approval of the regional commissioner, a condition barring *unauthorized* employment may be included in an appearance and delivery bond in connection with a deportation proceeding." 8 C.F.R. 103.6(a)(2) (1983) (emphasis added). The change from the previous regulation demonstrates an intentional shift when the regulation was rewritten. Similarly, in the

816–17.

notice accompanying the final rule, the INS repeatedly referred to this condition as a "no-work rider." 48 Fed.Reg. 51142–43 (Nov. 7, 1983). When the condition itself was discussed, rather than the justification for its enactment, it was generally described as barring "employment" and only occasionally as barring "unauthorized employment." *Id.*[3]

Finally, the language of the bond condition itself explicitly bars employment.[4] The INS Operating Instruction issued pursuant to the regulation was stayed by the injunction in this case. OI 103.6(i), Court Record at 44, Exhibit A. The Operating Instruction states: "where a condition against unauthorized employment is effective, the order to show cause shall be stamped 'Bond—*Employment Not Authorized.*'" *Id.* (emphasis added). The text of the Operating Instruction refers to this condition as "prohibiting unauthorized employment." *Id.* But it is the bond condition itself which will be seen and relied upon by the individuals to whom it is applied, employers, and the authorities who decide whether the condition has been violated—and this condition bars "employment."

The language of the bond condition, however, cannot be isolated from the context in which it is applied. This is the *same* language which appeared in the prior Operating Instruction, written under the previous regulation specifying "unauthorized employment," in which the determination as to its imposition on bonds was made in individual cases by the District Director with the approval of the Regional Director. OI 103.6i "Appearance and Delivery Bond", *reprinted in* Gordon & Mailman, Immigration Law and Procedure, Rev.Ed., 2 Appendix, Operations Instructions, at 23–65. Therefore the question of whether this condition bars "employment" or merely "unauthorized employment" is not separate from the determination of the individuals to whose bonds it will be applied.

## B. INDIVIDUALS SUBJECT TO THE BOND CONDITION

Individuals are arrested by the INS upon a "prima facie" showing of deportability, *Abel v. United States,* 362 U.S. 217, 232, 80 S.Ct. 683, 693, 4 L.Ed.2d 668 (1960), or of probable cause, *see Int'l Molders & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 552 (9th Cir.1986). Most take voluntary departure, *see INS v. Lopez–Mendoza,* 468 U.S. 1032, 1044, 104 S.Ct. 3479, 3486, 82 L.Ed.2d 778 (1984) (97.5% of illegal aliens arrested by the INS agree to voluntary departure without a hearing); some are released on parole, *see* 8 U.S.C. § 1252(a)(1).

For all those released on bond while awaiting determinations of deportability, the regulation imposes a "condition against employment" on *all* appearance and delivery bonds; it is not limited by status, work authorization, or the reasons deportation is sought. In the final notice promulgating the rule, the only limitation asserted was that the INS would not apply the rule to

---

**3.** The text refers fifteen times to a "no-work" rider or to a condition "barring employment" or "against employment." *Id.* at 51142–43. In contrast, the phrases "unauthorized work" or "working without authorization" appear five times: twice in describing the problem of unauthorized work by aliens in deportation proceedings (not the condition), once in relation to employment as the violation for which the alien is apprehended; once in a quotation, and once in describing the reasonableness of the bond condition. *Id.* at 51142. The bond condition is also described as barring "unauthorized employment" twice, including once in the same sentence which describes a "condition barring employment." *Id.* Some of these shifts in terminology arise because of an emphasis on the Attorney General's discretion to grant employ-

ment authorization under a regulation now codified at 8 C.F.R. § 274a.12(c)(13), discussed *infra.*

**4.** In response to questions at oral argument regarding the exact language to be used in the bond condition, both sides submitted uncertified copies of documents. One document was irrelevant since it was drafted under the prior regulation. We decline to take judicial notice of these documents. The language of the instruction is part of the record in this case, since it appears in a certified copy of the INS Operating Instruction which was the sole exhibit in the Motion for Summary Judgment made by the INS. Court Record at 44, Exhibit A.

permanent resident aliens.[5] 48 Fed.Reg. 51143. The INS Operating Instruction states: "Individuals maintaining a colorable claim to U.S. Citizenship and permanent resident aliens ... shall not be subject to this general prohibition until such time as a final administrative determination of deportability has been made," OI 103.6(i), Court Record at 44, Exhibit A. The language of the Operating Instruction implicitly claims the capacity to apply the bond condition to all and therefore supports a literal reading of the regulation. Even if the condition is not applied to permanent residents or to those with a "colorable claim of citizenship,"[6] all other appearance and delivery bonds are included in the mandatory language of the regulation.

If these exceptions were observed, the condition would still be imposed on all other appearance and delivery bonds. 8 C.F.R. § 274a.12 lists the categories in which individuals may be authorized to work. Besides permanent residents, there are ten other categories of aliens who are authorized to work incident to their status and need no authorization from the INS. These include aliens granted asylum, nonimmigrant fiances, or parents and dependent children of permanent residents, among others. Section 274a.12(b) lists sixteen categories of aliens authorized for employment with a specific employer incident to status, who also need not seek work authorization from the INS. These include temporary workers, nonimmigrant students employed less than 20 hours per week when school is in session, and treaty traders, among others.

Finally, § 274a.12(c) lists fifteen categories of aliens whose authorization for work is granted by the INS, including nonimmigrant students seeking off-campus employment, applicants for asylum or suspension of deportation—as well as aliens in deportation or exclusion proceedings who would be subject to the condition against employment but could apply for work authorization through the District Director. For those in § 274a.12(c), employment authorization automatically terminates upon the initiation of deportation or exclusion proceedings. § 274a.14(a)(1)(ii). They may then reapply for work authorization *if they are not in detention* under § 274a.12(c)(13). Approval is discretionary except for aliens who apply for asylum. § 274a.13(a). The INS has up to 60 days to make its decision. § 274a.13(d).

On appeal, the INS asserts that anyone who has work authorization can easily establish this fact. The plain language of the regulation and the agency's interpretation of it in the final notice and operating instruction show that these individuals are not protected from some interruption in their capacity to work, even if matters can be corrected later. The challenged regulation and the agency's interpretation of it show the bond condition would apply to all those who post bond while awaiting deportation proceedings, including aliens who have never had work authorization or legal status and those described above who have many different types of authorization and status, with the possible exception of permanent residents and individuals whose

---

**5.** The final notice states that the work authorization of those who have filed a non-frivolous application for asylum is governed by a different regulatory section (now consolidated at 8 C.F.R. 274a.12(c)), but it does not state that the provision barring employment will not be applied to bonds for these aliens. 48 Fed.Reg. 51143.

**6.** The instruction provides no procedures for discovering or distinguishing a "colorable" claim. In *Agosto v. I.N.S.*, 436 U.S. 748, 755 n. 5, 98 S.Ct. 2081, 2086 n. 5, 56 L.Ed.2d 677 (1978), the Supreme Court noted the uncertainties accompanying this term. The laws governing the acquisition and retention of citizenship

are extremely complex. *See generally* Gordon and Mailman, *Immigration Law and Procedure,* Sections 13.3—13.9A. (Noting "frustrating difficulties often presented by such assessments," *id.* at 13–39; "[C]onstant changes in the prescribed conditions have transformed a relatively simple inquiry into one which often is exceedingly and unnecessarily complex," *id.* at 13–38 to 13–39.) Because of this complexity, some people may not know they are citizens unless they receive legal advice. The INS has pointed to no procedure to help detect such individuals. Absent such inquiry, this may really be protection only for individuals who already know they have a "colorable claim of citizenship."

claims of citizenship appear "colorable" to the INS.

On appeal, the INS says that it will not apply the provision to anyone who has work authorization. But the mandatory and sweeping language of the bond rider does not distinguish aliens of different status. Justice Douglas, sitting as Circuit Justice for the Ninth Circuit, once addressed a similar argument regarding a bond condition barring association with any Communist: "On oral argument the Department of Justice says that the language would not, as a matter of administrative practice, be construed that way. But there is a broad sweep to the language that would permit another ruling on a different day." *Yanish v. Barber*, 73 S.Ct. 1105, 1108, 97 L.Ed. 1637 (1953) (Douglas, J., in chambers).

## C. DETENTION AND WORK

Also at issue is the interest at stake in this regulation: is it merely a prohibition against work, or an expanded exercise of detention? The INS claims absolute power to detain if there are grounds for arrest as a deportable alien; any release at all is "a matter of grace." This argument assumes what it must prove: work becomes the sole issue *only* if the authority to detain is unlimited. Detention cannot be effectively distinguished from a work-related condition on release, since both the regulation and the notice which promulgated it explicitly show that the bond condition links detention with refraining from work. Since "[a] condition barring employment *shall be imposed*" on bonds, 8 C.F.R. § 103.6(a)(2)(ii) (emphasis added), those who do not accept the condition are subject to continued detention.

In addition, when the INS promulgated the final rule on this regulation in the Federal Register, it specifically distinguished the "no-work" condition from a money bond. 48 Fed.Reg. 51142. The purpose of a money bond is to insure the alien's appearance. The violation of a condition barring employment would not lead to forfeiture of the money. "Where the 'no

work' condition is violated, the appropriate response would be to take the alien into custody. . . . Rather [than being tied to the money bond], 'no work' is a condition of release which, if violated, gives the Service the right to order the alien to surrender and appear." *Id.* If the alien failed to appear, the bond would then be declared in default. *Id.* This discussion, offered to reassure commenters who feared the money bond would be subject to forfeit merely for the act of working, explicitly demonstrates that detention will be the result if the alien works. It further clarifies this connection by separating these issues from the link between the money bond and the appearance of the alien. During appeal as well, even while attempting to distinguish detention from a bond condition regarding employment, the INS has repeatedly stated that the alien would be detained if the condition were violated.

While the INS has attempted throughout the course of this litigation to characterize the regulation as a bond condition with respect to employment, in practice it recognizes that if the regulation were implemented, the result would be an increase in the number of aliens detained. The INS has stated that "[t]he possibility that a bonding company might require more collateral or charge higher premiums was also considered. As a corollary of these possibilities, it was also assumed that more aliens might have to be detained. This latter possibility was considered an acceptable consequence." 48 Fed.Reg. 51143 (1983). The plaintiffs, in their Exhibits and Supplemental Exhibits, contended that bonding companies may, in response to the imposition of the no-work condition on the bond, refuse to underwrite immigration bonds entirely or charge significantly higher premiums which most aliens will not be able to afford. The INS did not contest these claims. Rather, it agreed that bonding companies may change the manner in which they conduct business, resulting in an increase in the numbers of those detained: "Plaintiffs might be correct in speculating that the new regulations will make

it more difficult for many persons to bond out of detention." Thus, the proposed regulation, while facially concerned with employment, will in fact result in the detention of a significant number of aliens.[7]

Although people subject to this condition are differently situated with regard to work, they are similarly situated with regard to detention. The challenged regulation permits application for work authorization under another regulation, now recodified at 8 C.F.R. 274a.12(c)(13), if "compelling reasons" are shown. 8 C.F.R. 103.-6(a)(2)(iii). However, under 8 C.F.R. 274a.12(c)(13), the alien cannot apply for this relief while he or she is detained. Application for authorization to work is dependent upon release from detention; release from detention is conditioned upon the promise not to work. Both detention and work are at stake here.

## D. THE BURDEN OF PROOF AND PRESUMPTIONS

Finally, the parties dispute whether this is a "blanket provision" or a system of individualized determinations in which the burden has been shifted to create a presumption that work is unauthorized. We note that there are really two presumptions: first, that affected individuals can be detained, either absolutely or conditionally upon refraining from employment, and second, that they lack work authorization. The INS has done more than shift the "burden" of proving work authorization. It has added the burdens involved in extended detention.

The district court found that the no-work rider is a blanket condition. We agree with the district court. The regulation is mandatory and the condition will be applied to individuals in a great variety of situations. The provisions governing work authoriza-

---

7. The plaintiffs, in their Exhibits and Supplemental Exhibits, outline the dimensions of the problem. It is unclear whether bonding companies will underwrite bonds with a no-work condition stipulated on the face of the bond. The declarations of bondsmen working in this field suggest that the answer is "no," and the INS has not contested the assertions made to this effect in many of the plaintiffs' declarations. Generally, aliens in deportation proceedings lack the financial resources to enable them to post any significant portion of their bond. They frequently borrow funds from relatives or friends, and with these amounts, contract with a bonding company to put up the full bond with the INS; their relatives or friends then serve as guarantors. Raul Atler, a bondsman at a Los Angeles bond company which bails out persons undergoing deportation proceedings, declared under penalty of perjury that in his discussion with other immigration bond people, "most state that they will not place bonds with INS in deportation cases if the client is prohibited from working as a condition of the bond. Some will stop writing immigration bonds when the 'no work' bond condition goes into effect." Michael Hernandez, another Los Angeles bondsman who has discussed this issue with representatives of bonding companies in California and other states, concurred with Alter's assessment. The unwillingness of bonding companies to write immigration bonds with a no-work condition is a nationwide problem. Fourteen declarations by directors of pro bono legal services and immigration attorneys throughout the country have stated that bonding companies have made it clear to them that they will not place bonds with the INS, except in rare cases, if a condition of the bond prohibits the client from employment. Many bonding companies simply "will not put up collateral for an individual who is not allowed to work to pay off that bond." Enforcement of the regulation would have enormous implications in regions outside of the major metropolitan areas. The director of the Willamette Valley Immigration Project in Oregon found that "out-of-state bonding companies who ordinarily write immigration bonds will refuse to do so where a 'no-work' rider has been imposed. These companies represent the only alternative source of bond, since no such companies exist in Oregon." With bonding companies unwilling to place bonds with the INS, or willing to do so only by charging a substantially higher rate, a larger number of aliens will be unable to bond out and will simply remain in detention until their applications for withholding of deportation or for asylum are resolved.

Furthermore, relatives or friends may be more reluctant to serve as guarantors of an immigration bond which prohibits employment on its face. They may believe, correctly or incorrectly, that there is a greater likelihood that the bond would be forfeited. Thus, the no-work condition may deter potential guarantors; in fact, in at least one case, according to the uncontested evidence, the threat that the regulation would be implemented has already had such an impact.

However the INS may attempt to characterize the regulation, the ultimate result is that a substantially larger number of aliens will be unable to secure immigration bonds and will be detained indefinitely pending the resolution of their claims.

tion apply only after the condition has been imposed. Even if aliens in one or two categories were excepted from the condition, the possibility of obtaining work authorization for some aliens at a later time would not transform this into a system of individualized determinations. This is a blanket condition.

## II. STATUTORY AUTHORITY FOR THE REGULATION

■ The Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., is a comprehensive legislative scheme intended to govern all aspects of the admission of aliens to the United States. Regarding arrest and custody of aliens subject to deportation hearings, it provides:

§ 1252. Apprehension and deportation of aliens. (a) Arrest and custody; review of determination by court. (1) Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody ... [A]ny such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole....

8 U.S.C.S. § 1252(a) (Law. Co-op.1987 & Supp.1989).

The statutory question which has, from the outset, been presented in this case is whether the blanket imposition of a condition against employment in appearance and delivery bonds is within the discretion of the Attorney General under this provision. Since acquiescence in the provision is a condition of release from detention, and since violation of the condition would again lead to detention, we review both the power to detain and to impose the bond condition

at issue. See Flores v. Meese, 913 F.2d 1315, 1322 (9th Cir.1990) ("[S]ince the Attorney General's detention and bond release condition powers are interrelated, and their statutory evolution intertwined, we will examine them together"). We first examine the legislative history of the provision and the cases in which this statutory authority has been construed and applied, to determine the intentions of Congress and the basis on which discretion must be exercised. We then examine employment as a focus of the INA, including the amendments put in place by IRCA, for its relevance to the question of detention and bond conditions. We then review the cases which have ruled on bond conditions and similar restrictions imposed by the Attorney General under § 1252. We conclude, as have all prior opinions from this court and the district court, that this regulation is beyond the statutory authority conferred on the Attorney General by the INA.[8]

### A. THE LEGISLATIVE HISTORY OF THE STATUTE

Section 242(a) of the Immigration and Nationality Act, 8 U.S.C. § 1252(a), originated as Chap. 29, § 20 of the Immigration Act of 1917, which granted the agency responsible for immigration policy the power to release individuals on bond pending a deportation hearing. Act of Feb. 5, 1917, ch. 29, § 20, 39 Stat. 874, 890–91 (1917). Prior to 1952, § 20 made no reference to "discretion" and specifically limited the use of bonds to ensuring an alien's future appearance at a deportation hearing:

Pending the final disposal of the case of any alien so taken into custody, he may be released under a bond ... conditioned that such alien shall be produced when required for a hearing or hearings in regard to the charge upon which he has been taken into custody, and for deportation if he shall be found to be unlawfully within the United States.

Act of Feb. 5, 1917, ch. 29, § 20, 39 Stat. 874, 891 (1917).

---

**8.** Because we hold the regulation unauthorized on statutory grounds, we do not reach the question of whether the regulation violates due pro-

cess. *Jean v. Nelson,* 472 U.S. 846, 854–55, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985).

By 1950, Congress found this language inadequate to deal with its increased concern over subversion, since some courts construed the "may be released under a bond" language as a matter of right. *Carlson v. Landon*, 342 U.S. 524, 539, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952). Therefore, in 1950, Congress amended the immigration statute as part of the Subversive Activities Control Act. Internal Security Act of 1950, 64 Stat. 987, Title 1 (Subversive Activities Control Act of 1950), § 23. The provision regarding the Attorney General's discretion from the 1950 Act was incorporated into the 1952 Immigration and Nationality Act, and remains as § 242(a) today. Ch. 477, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1252(a) (1988); *see* H.R.Rep. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Admin.News 1653, 1711 ("This provision, in general, follows the procedure established by section 23 of the Subversive Activities Control Act of 1950.").

We recently reviewed the legislative history of this provision in depth, *Flores v. Meese, supra,* at 1322–1325, and need only briefly reexamine it here. Congressional discussion of this statutory provision first appeared in the reports on H.R. 10, a bill that did not pass. H.R.Rep. No. 1192, 81st Cong., 1st Sess. (1949) ("Facilitating the Deportation of Aliens from the United States, Providing for the Supervision and Detention Pending Eventual Deportation of Aliens whose Deportation Cannot be Readily Effectuated Because of Reasons Beyond the Control of the United States"); S.Rep. No. 2239, 21st Cong., 2d Sess. (1950) ("Facilitating Deportation of Aliens"). The primary focus of these reports was on aliens who had been determined to be deportable but who had not in fact been deported. Congress was particularly concerned with dangerous aliens whose deportation could not be effectuated: Of the six examples given in the House and Senate Reports, two were Communist leaders who had been found deportable 18 years and 21 years earlier; four were criminals (two child molesters, two habitual criminals). H.Rep. 1192, 81st Cong., 1st Sess. (1949) at 8–9; S.Rep. 2239, 81st Cong., 2d Sess. (1950), at

7–8. As one measure of increasing control over deportable aliens, the bill authorized the Attorney General to hold arrested aliens in custody, release them on bond, or on conditional parole, pending final determination of their deportability and for a six-month period after an order of deportation was issued. S.Rep. No. 2239 at 5.

The language of the bill placed no limits on the authority granted to the Attorney General. The original draft mandated that all bonds include a condition requiring the alien to appear when ordered to do so, but this requirement was dropped before the statute was enacted. The Congressional reports stated that the Attorney General was to have "untrammeled" authority to impose conditions; however, the examples of conditions which were listed in the reports were conditions applied to individual cases and concerned matters related to the appearance of the alien or the amount of the bond. H.Rep. 1192, 81st Cong., 1st Sess. at 6; S.Rep. 2239, 81st Cong., 2d Sess. at 5. Nothing else in the reports and nothing in the statute indicated what the range of permissible conditions might be or whether a blanket condition could be imposed.

## B.  THE EXERCISE OF DISCRETION

In *Flores,* we therefore found that the bill upon which this statutory section was patterned "was meant to confer broad power upon the Attorney General to detain aliens prior to a final determination of deportability," at 1325, and that the Attorney General was authorized to prescribe bond conditions "beyond merely insuring appearance." At 1325. The Attorney General's detention was "not limitless," but he had "broad discretion in acting to fulfill the purposes of [the immigration] laws." *Id.* Therefore, although "perhaps the primary purpose" of detention was securing appearance, we rejected an argument that any regulation regarding detention must have the *sole* purpose of ensuring appearance at deportation hearings. The regulation in *Flores,* governing the release of alien minors to certain adults, was authorized by statute because it was rationally related to

securing appearance. At 1326–1327 (noting that "the decision of whether to detain or release a juvenile depends on the likelihood that the alien will appear for all future proceedings") (quoting 53 Fed.Reg. 17449). We noted that the regulation also served additional purposes rationally related to the statute, such as ensuring the well-being of alien minors, but found that the presence of these other purposes did not render the regulation beyond the Attorney General's rulemaking authority. At 1326–1327.

We commented that the statutory language "discloses no limitation on the Attorney General's detention power before an order of deportation is made final, except perhaps that implied by the word 'discretion.'" *Id.* at 1322. *Flores* did not review the cases which tested the statutory grant of discretion to the Attorney General to detain and set bond conditions. No such review was necessary, because the condition was rationally related to securing appearance, which we recognized as a primary purpose of the detention power. Once we determined conditions need not be concerned *solely* with appearance, we did not need to look farther.

However, these questions confront us now. The regulation at issue here bears no relation to ensuring appearance, nor has any such relation been claimed. Rather, the administrative notice promulgating the rule stated explicitly that prevention of employment by illegal aliens and safeguarding of employment of United States citizens and permanent resident aliens was more important than increased detention costs. 48 Fed.Reg. 51152.

We are therefore squarely presented with questions not at issue in *Flores:* In order to determine whether conditions are rationally related to the statute, we must determine how the statute has been construed. Since conditions are not limited to those *solely* concerned with ensuring appearance, we ask what limits constrain the power to detain and set conditions which Congress has granted to the Attorney General, and whether the condition imposed by

the regulation at issue here falls within the limits of the Attorney General's discretion.

In *Flores*, we applied the standard first articulated in *Sam Andrews' Sons v. Mitchell*, 457 F.2d 745 (9th Cir.1972), which stated that the Attorney General's regulations must be upheld if they are founded on "considerations rationally related to the statute he is administering." *Flores*, *supra*, at 1322. *Flores* found we need only inquire into the existence of this rational relationship, *id.*, which it found met by the connection between securing appearance and releasing children only to certain adults.

In *Sam Andrews' Sons*, we made this inquiry, found that the rational relationship had not been established, and struck down for abuse of discretion a regulation which determined where alien commuters could be employed. The regulation in *Sam Andrews' Sons* provided that green cards could not be used to secure reentry into the United States for employment at a place of business where the Secretary of Labor had determined that a labor dispute existed. 457 F.2d at 747. We held this regulation not rationally related to the statute because it was not based on a rational distinction between different classes of aliens and because there was no hint in the statute or its legislative history that Congress intended the green card system to be used as a means to intervene in domestic labor disputes. *Id.* at 748.

To apply the "rational relationship" standard as articulated in *Sam Andrews' Sons* and *Flores*, we do not make sweeping statements regarding the statute's general concerns; rather, we must evaluate what the statute does and does not authorize in order to evaluate the regulation. We must inquire, as we did in *Flores*, whether the regulation is rationally related to the Attorney General's detention power. If it is, under *Flores*, the existence of additional purposes also rationally related to the statute will not render it invalid. *See Flores*, *supra*, at 1326–1327.

In *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), the Supreme Court upheld the detention without bail

under this provision of several Communist activists. In *Carlson,* the Supreme Court relied upon the purpose of the Internal Security Act to deport alien Communists as a menace to the public interest, and pointed to the evidence in each instance of "membership plus personal activity in supporting and extending the Party's philosophy concerning violence" which justified the Attorney General's discretion. *Id.* at 541, 72 S.Ct. at 534.

*Carlson* affirmed a Ninth Circuit decision which was part of a series of holdings defining the scope and proper exercise of the Attorney General's discretion. The aliens in *Carlson* first appealed when they were detained without bail pending determinations of deportability, and the district court ruled against them on habeas corpus. *Carlson v. Landon,* 186 F.2d 183 (9th Cir. 1950). We found the Internal Security Act was a constitutional response to a serious threat to national security. *Id.* at 187–188 (quoting Congressional findings of dangers of subversion). However, the provision governing detention before deportation hearings "does not give the Attorney General or the Director absolute and final power to deny bail. Instead ... [the provision] left bail to the discretion of the Attorney General rather than to his unlimited power to deny it...." *Id.* at 185–86. The exercise of discretion was not consistent with the claim in the government's briefs "that the Director, under instruction from the Attorney General, can hold or release the alien without revealing his reason for the choice...." *Id.* at 189. Although it was "arguable" that Congress might have meant to clothe the Attorney General with the unrestricted power to hold the alien without bail, this circuit and all other courts to address the subject agreed that "the Act cannot be so construed." *Id.* at 188.

The District Director of the I.N.S. had stated that he had reasonable cause to believe that Carlson's release would be prejudicial to the public interest and would endanger the welfare and safety of the United States. But this assertion was insufficient: "[T]he power to grant bail before a deportation hearing or refuse it, carries with it the necessity of exercising discretion and certainly discretion must be based upon some phase of fact." *Id.* at 186. Detention could not be sustained without a statement of "some fact upon which a reasonable person could logically conclude that the denial of bail is required to protect the country or to secure the alleged alien's presence for deportation should an order to that effect be the result of the hearing." *Id.* at 189. The case was remanded for the Attorney General "to reveal reasons for exercising his discretion, if he did exercise discretion in denying bail...." *Id.*

In *Mangaoang v. Boyd,* decided days after the first *Carlson* opinion, we confronted slightly different facts. 186 F.2d 191 (9th Cir.1950). Mangaoang, the petitioner, declared there was a lack of evidence that he had ever been a member of the Communist Party, and that no evidence would be introduced that he was now a member or had been within five years before the warrant. *Id.* at 196. The District Director explained that the hearing would be held within two weeks, and that Mangaoang had been detained after the case had been examined in light of the Internal Security Act, considering all factors in the alien's situation and hardships which would be imposed. A message from the Assistant Commissioner of Immigration and Naturalization stated the aliens had been detained upon his order, under the authority of the Attorney General under the statute, following similar considerations to those the District Director described. *Id.*

We reversed the district court's judgment against the petition, which had been based upon "the error of law that proof of consideration of the facts relating to an alien under arrest was all that the situation required and that the Director was under no duty of revealing any of such facts." *Id.* at 197. Even though the hearings would be prompt and not drawn out, such evidence "does not satisfy the requirement that the denial of bail be based upon some specific fact pointing to the petitioners as bad risks to enlargement on bail." *Id.* at 196. Mangaoang did not again appeal the bail issue and appears not to have been

further detained, though he successfully contested alienage.[9]

In *Carlson,* on remand, the District Director gave specific evidence of continuing subversive activities by each of the aliens. The district court again upheld the denial of bail, and the aliens again appealed to the same panel of this court. *Carlson v. Landon,* 187 F.2d 991 (9th Cir.1951). We explicitly stated our adherence to our earlier opinion, *id.* at 994, and summarized what the Attorney General must show: "discretion exercised ... upon the question as to whether the release of appellants on bail would likely endanger the security of the United States and whether they likely would fail to present themselves at the deportation hearings." *Id.* at 993. The information that each of the detained aliens had been active in the Communist Party in 1949 provided the basis for the Attorney General's discretion in denying bail. "After viewing the whole case as to each petitioner," we affirmed the district court. *Id.* at 1003.

The aliens appealed to the Supreme Court, which affirmed in *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952). Nothing in the *Carlson* opinion limited our holding that discretion must be exercised upon facts shown about each detained individual. The Supreme Court first stated that detention was consistent with the power to deport because "[o]therwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings." 342 U.S. at 528, 72 S.Ct. at 528. Discretion to detain aliens without bail was placed in the Attorney General *because* "purpose to injure could not be imputed generally to all aliens subject to deportation...." *Id.* Since the four petitioners in *Carlson* were active in Communist work and the petitioner in the companion case was active in Communist activities, the discretion placed in the Attorney General was broad enough to justify detaining all these

parties without bail "as a menace to the public interest." *Id.* at 541, 72 S.Ct. at 535.

Rather than changing our definition of the Attorney General's discretion, the Supreme Court's interpretation in *Carlson* supported it in several ways. First, more than mere membership in the Communist Party was required as a basis for detention. The requirement that the individual be *active* in subversive work as well as a member of the Party is significant, since membership in the Communist Party was sufficient to make an alien deportable. *Id. Carlson* cannot be read to support the current claim by the INS that *any* grounds for deportation will also be grounds for detention.

Further, this was not a blanket denial of bail. "There is no evidence or contention that all persons arrested as deportable under § 22 of the Internal Security Act ... for Communist membership are denied bail." *Id.* at 541–42, 72 S.Ct. at 535. In fact, bail was allowed in most cases. *Id.* at 542, 72 S.Ct. at 535.

Finally, Congress' delegation of power to the Attorney General was permissible because the legislative standards were clear: "When in the judgment of the Attorney General an alien Communist may so conduct himself pending deportation hearings as to aid in the carrying out the objectives of the world communist movement, that alien may be detained." *Id.* at 544, 72 S.Ct. at 536. *Carlson* thereby confirms the requirement of individual dangerousness we had imposed in *Mangaoang* and the earlier *Carlson* opinions.

Discussing judicial review of detention decisions, *Carlson* quoted factors on which discretion was to be exercised from *United States ex rel. Potash v. District Director of INS,* 169 F.2d 747 (2d Cir.1948) (*Potash* ), a case under the old statute rather than under this statutory provision:

> The discretion of the Attorney General ... is interpreted as one which is to be reasonably exercised upon a considera-

**9.** Mangaoang was later held not to have been an alien but a national of the United States during the period when he was a member of the Communist Party. He was therefore not deportable.

*Mangaoang v. Boyd,* 205 F.2d 553 (9th Cir.), *cert. denied,* 346 U.S. 876, 74 S.Ct. 129, 98 L.Ed. 384 (1953).

tion of such factors, among others, as the probability of the alien being found deportable, the seriousness of the charge against him, if proved, the danger to the public safety of his presence within the community, and the alien's availability for subsequent proceedings if enlarged on bail.

*Carlson*, 342 U.S. at 540, 72 S.Ct. at 534. These factors reflect the same focus on danger and, particularly, on specific evaluation of the individual.

In *Ocon v. Landon*, 218 F.2d 320 (9th Cir.1954), we interpreted the same provision as part of the Immigration and Naturalization Act.[10]  *Id.* at 322–323. Ocon had been released and redetained under this provision; he argued that the Attorney General would have to find new information against him in order to redetain him. *Id.* at 323. We held his detention permissible because there was evidence of his continued subversive activities.

*Ocon* acknowledged how great a power had been invested in the Attorney General by this provision:

> In reading Mr. Justice Black's dissent in the Carlson case, supra, it becomes apparent that he felt the impact of the jailing of a person who had not even been charged with a crime. We feel it too. . . . [but since Ocon did not deny any charges against him] his interim custody after continued and undenied Communist activity puts a different light upon [this] bald statement.

218 F.2d at 326. The *Ocon* court, like the earlier Ninth Circuit opinion in *Carlson*, justified this "jailing of a person . . . not even charged with a crime" by the dangers of subversion which Congress had recognized when it passed the Internal Security Act. Further, *Ocon*'s description of the detention power is a weighty one: "[I]t is the solemn duty of the Attorney General to revoke the bail the moment he has information which in reason appears to subject the

United States to hurt by the alien while at large." *Id.* at 324.

However, even while it emphasized the extraordinary power and responsibility conferred here, *Ocon* held that the Attorney General must act "upon an *informed* discretion." *Id.* (citing *Carlisle v. Landon*, 73 S.Ct. 1179, 97 L.Ed. 1642 (Douglas, J., in chambers)) (emphasis in original). Discretion was *"informed"* when Ocon demonstrated "continued and undenied" Communist activity in the period before he was retaken into custody. *Id.* at 326. The court emphasized the dangers of subversion in this period and the nature of the Congressional response. *Ocon* quoted a statement from *U.S. ex rel. Yaris v. Esperdy*, 202 F.2d 109, 111 (1953), also quoted in *Rubinstein v. Brownell*, 206 F.2d 449 (D.C. Cir.1953), *aff'd per curiam by an equally divided court*, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954), holding that the allegation of communist activity up to the time of rearrest refuted the claim of abuse of discretion in revoking bail.

*Rubinstein v. Brownell* held that the exercise of discretion must be a reasonable one, *id.* at 455, and that where the alien was *not* dangerous to society and there was no suggestion that he would flee or hide, the Attorney General could not detain him. *Id.* at 456. This is consistent with *Hernandez–Avila v. Boyd*, 294 F.2d 373 (9th Cir.1961), in which we found no abuse of discretion in high bail under this provision when the alien faced embezzlement charges in both the United States and Mexico, had no firm ties in the district where he was apprehended, and had repeatedly fled to avoid facing deportation.

▮ From these cases emerges an unmistakable emphasis on the situation of each individual as the focus of the exercise of discretion. The significant power which is placed in the Attorney General must be exercised on the specific, individual circumstances of the person who faces the determination of his alienage or deportability

---

10. Although Ocon's hearing had since been decided, the court analyzed his detention under 8 U.S.C. § 1252(a) because no "final order" had been issued as his case was still under review. *Id.* at 323. This is the same analysis followed by the District of Columbia Circuit in *Rubinstein v. Brownell*, 206 F.2d 449 (D.C.Cir.1953), *aff'd by an equally divided court*, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954).

under this statutory section. Further, the considerations involved are outlined consistently from *Potash* under the old statute, through *Carlson* and its connected cases under the Internal Security Act, through *Ocon* and *Rubinstein* under the INA. The detention power which the Attorney General is granted discretion to exercise is one concerned—in addition to ensuring appearance—with protecting the nation from danger, from active subversion.

This leaves us with two questions which must be answered in order to determine whether the challenged regulation imposing a condition against employment is within the discretion of the Attorney General: whether unauthorized employment is the type of harm or danger contemplated in the grant of this detention power, and whether bond conditions are limited by the scope of the detention power. We turn first to an examination of the question of unauthorized employment.

### C. EMPLOYMENT IN THE LEGISLATIVE SCHEME OF THE INA

*Before IRCA*

Since 1952, Congress has amended the INA numerous times, including many provisions dealing with employment. However, it has never amended § 242(a). *See generally* Hutchinson, Legislative History of American Immigration Policy 1798–1965 (1981); Harper, Immigration Laws of the United States (1975). Virtually every immigration act and amendment has dealt in some fashion with employment policy, and the Supreme Court has recognized that a "primary purpose in restricting immigration is to preserve jobs for American workers." *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 893, 104 S.Ct. 2803, 2809, 81 L.Ed.2d 732 (1984).[11] However, even if employment is an important concern of immigration law, it does not at all follow that detention and bond conditions related to employment

either cohere with the legislative scheme or are within the discretion of the Attorney General.

Nothing in the Act explicitly authorizes detention in relation to employment, and nothing suggests the appropriateness of *blanket* employment-related conditions. In fact, ₁the INA draws careful distinctions between different categories of aliens based on family ties, student, business or professional status, and many other characteristics. 8 U.S.C. § 1101(a)(15)(A–N); 1101(a)(27)(A–I). A blanket condition barring employment is inconsistent with this complex legislative and regulatory scheme.

Prior to the enactment of the regulation, employment or the prospect of employment had generally been deemed a positive factor in determining the conditions under which to release aliens from detention. According to the undisputed evidence, in setting immigration bonds immigration judges frequently determined the amount of the bond "based on an assessment of the stability of the individual, with the prospect of employment being one of the most significant stabilizing facts. Unavailability of employment might result in substantially higher bonds, and a resulting substantial increase in the numbers of those unable to be bonded out." As the Director of the Center for Immigrant Rights stated in her declaration, "[t]raditionally, in bail reduction hearings, a job or an offer of a job has always been considered a positive element because that means stability and an assurance that the immigrant will not abscond." With the proposed no-work condition, the INS has effectively turned what was previously deemed a positive characteristic and an indicium of stability into a prohibited activity. The INS concedes that traditionally employment has been deemed a favorable factor: "Defendants admit that in the past in some bond proceedings immigration judges have considered the alien's employment history as indicative of stability and an assurance that he will not abscond."

---

**11.** Although *Sure–Tan* also quoted *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), on the "peripheral" concern of the INA with employment, 467 U.S. at 892, 104 S.Ct. at 2808, both cases were essentially concerned with preemption or applicability of state or other federal laws. Neither case held that immigration policy was unconcerned with alien employment.

The INS claims, however, that "this is logically and legally irrelevant to this lawsuit...." We disagree. To the extent that past practices are inconsistent with the proposed regulation, they are relevant to the question whether the no-work condition and detention in response to employment was authorized prior to the enactment of IRCA.

Further, our review of the treatment of employment riders by the Board of Immigration Appeals and the Attorney General discloses no authority for *detention* in relation to unauthorized employment. Employment riders were first applied to appearance and delivery bonds in the early 1970s, and the Board twice divided over their legality. *Matter of Toscano–Rivas,* 14 I & N 523, Int.Dec. # 2256 (1973). Detention was not considered a permissible response to unauthorized employment: the INS had "emphatically disavow[ed] any general service policy of rearresting the recalcitrant alien who violate[d] the condition once released." *Id.* at 542. Only the money associated with the bond might be forfeited. *Id.* at 539 ("The penalty is not detention ... but the loss of the $500"), 539 n. 2 ("The threat of forfeiture of the bond is a deterrent. Custody is something else. Even if the bond is breached, it by no means follows that confinement is desirable or indicated, or will necessarily take place."). The attorney general's discretion regarding detention must be "based on a new and different set of considerations." *Id.* at 539 n. 2. The BIA had found that detention was impermissibly implicated solely because it was the leverage by which the agreement to the bond condition was extracted. *Id.* at 540–541. The language of the bond, attached to the Attorney General's opinion, reveals that the money was conditioned upon both the appearance of the alien and his refraining from employment unless authorized by the INS. *Id.* at 557–58.

At the request of the Board, the Attorney General examined the specific question of his authority to impose employment-related conditions. *Id.* at 550 (1974). Reviewing *Carlson, Rubinstein,* and *Witkovich,* the Attorney General found that employment-related conditions were clearly acceptable during the six month period after deportability was established in "cases in which an alien's past employment would have a direct bearing upon his availability for hearings or deportation or upon national security." *Id.* at 556. Obviously, availability and national security are the same considerations which underlie the detention power; this cannot be read as a firm conclusion by the Attorney General that the power to impose bond conditions was broader than the power to detain. The Attorney General went then on to suggest that "the various purposes of the immigration laws, including safeguarding employment opportunities for legal residents, *may* suggest the appropriateness of various bond conditions." *Id.* at 556 (emphasis added). However, he emphasized the necessity of a regulation to guide determinations of such bond conditions. Although non-standard riders already required approval by a regional commissioner, "additional substantive safeguards would be appropriate with respect to the condition at issue here." *Id.* at 556–57 & n. 23.

This review by the Attorney General, relied upon by the INS as authority for the challenged regulation, 48 Fed.Reg. 51142, is at most a tentative and partial approval, under the statutory structure existing at the time, of the imposition of money bonds against unauthorized employment under carefully structured individual circumstances. It does not support the mandatory blanket no-work condition imposed by the regulation. *Toscano–Rivas* shows concern for the limits courts have placed on bond conditions and states the Attorney General's belief that individualized determinations with structured review procedures were necessary for any such condition to be imposed. The INS had disavowed any intention of detaining aliens who worked without authorization, and the Attorney General made no reference to such detention. Put another way, he claimed no unlimited power to detain under the INA, no authority to detain in response to employment violations, nor any authority that would have included blanket conditions.

This brings us again to the point the district court and this court have reached before. Before IRCA, this regulation was beyond the authority conferred by the statute.

*After IRCA*

Ironically, although this case was remanded for further consideration in light of IRCA, both parties state that IRCA has made no difference to the authority for this regulation. The INS argues that our prior opinions were wrongly decided, and that IRCA merely re-emphasizes the concerns with employment which are evident in the INA. The NCIR argues that authority for the regulation never existed, and that IRCA has not granted such authority. We review the statute to determine whether IRCA changed the discretion invested by this provision or represented a Congressional finding regarding the dangers of unauthorized employment which would justify imposing the blanket no-work rider.

IRCA is a carefully crafted political compromise which at every level balances specifically chosen measures discouraging illegal employment with measures to protect those who might be adversely affected. *See* Mazzoli, *Immigration Reform: The Path to Passage and Beyond,* 14 J.Legis. 41 (1987) ("this legislation represents a delicate balance between widely divergent views and interests about immigration"). It states a tempered enforcement policy qualitatively different from the sweeping concerns with subversion of the Internal Security Act:

> Section 115. Enforcement of the Immigration Laws of the United States.
>
> It is the sense of Congress that—
>
> (1) the immigration laws of the United States should be enforced vigorously and uniformly, and
>
> (2) in the enforcement of such laws, the Attorney General shall take due and deliberate actions necessary to safeguard the constitutional rights, personal safety, and human dignity of United States citizens and aliens.

Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359, 3384. *See* Montweiler, The Immigration Reform Law of 1986: Analysis, Text and Legislative History (1987).

In the Internal Security Act, Congress had made extensive and explicit findings regarding what it determined was grave danger to national security, emphasizing foreign direction and control of political movements, as well as the participation by individual "disloyal aliens" in these threats to national security. Internal Security Act of 1950, Sec. 2, *quoted in Carlson,* 186 F.2d at 187. A close examination of IRCA reveals that it clearly distinguishes employment concerns from threats to national security. Under Section 201(a) of IRCA, national security remains grounds for exclusion which may not be waived in the course of legalization. 8 U.S.C. § 1255a(d)(2)(B)(ii)(IV). The paragraphs explicitly retained by IRCA exclude Communists, anarchists, or others who advocate the violent overthrow of the United States government. 8 U.S.C. § 1182(a)(28)(C), (D), (F). This provision also continues to exclude "[a]liens who ... the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally *to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.*" 8 U.S.C. § 1255a(d)(2)(B)(ii)(IV); 8 U.S.C. § 1182(a)(27) (emphasis added).

In direct contrast, IRCA's legalization provisions specifically render *inapplicable* (not merely waivable at the Attorney General's discretion) the grounds for exclusion in the INA which govern aliens entering the United States for skilled or unskilled work without labor certification. 8 U.S.C. § 1255a(d)(2)(A); 8 U.S.C. § 1182(a)(14). Also, no alien may be found inadmissible on grounds concerned with becoming a public charge "if the alien demonstrates a history of employment in the United States evidincing self-support without receipt of public cash assistance." 8 U.S.C. § 1255a(d)(2)(B)(iii). The structure of the grounds for exclusion shows that Congress did not consider unauthorized employment by individual aliens as the sort of danger to

the nation addressed in § 1182 and the Internal Security Act.

In addition to these distinctions in the text of the statute, the legislative history of IRCA reveals a carefully crafted, balanced approach to the problems of illegal immigration. The Senate Report explained that "The Committee bill is intended to increase control over illegal immigration," and that "[t]he primary incentive for illegal immigration is the availability of U.S. employment." S.Rep. 99–132, 99th Cong., 1st Sess. 1 (1985). The report described serious problems associated with illegal employment, including loss of jobs for low-income Americans, *id.* at 5–6, but also emphasized that many problems caused by illegal immigration arose from difficulties with assimilation into America.[12] The Senate placed particular significance on these social factors:

> Although population and direct economic impacts are of great significance, we think most people would agree that the national interest of the American people also includes certain even more important and fundamental aspects, such as the preservation of freedom, personal safety, and political stability—as well as the public cultural qualities and the political institutions which are their foundation.

*Id.* at 6.

Similarly, when the Senate explained "[t]he [s]olution" embodied in IRCA, *id.* at 7, it first noted that there were "only two types of solution available to the problem of illegal immigration." *Id.* It then described these two different approaches to illegal immigration. The first was *direct enforcement*, which included physically preventing entry into the United States through border patrol and interdiction, and finding and deporting those who were successful in entering illegally or entered legally and then violated the terms of their visas.[13] The second approach involved *reducing the incentives to enter.* IRCA's solution was a program "which combines direct enforcement at reasonable levels with a reduction in the incentives to enter the United States." *Id.* at 8.

Reducing the incentive of unauthorized employment was key to reducing incentives to enter. These incentives to enter illegally were created by the disparity in job opportunities between the United States and the Third World. *Id.* In light of the difficulties of changing these incentives in the short term by directly tackling this substantial disparity through Third World development, and the unacceptability of reducing the disparity through deterioration in the United States, "only one approach remains: to prohibit the knowing employment of illegal aliens." *Id.* Therefore, the Senate chose to penalize "employers who knowingly employ illegal aliens and ... persons who knowingly and for a fee or other consideration recruit or refer for employment such illegal aliens." *Id.*

Following this approach, the principal sanctions in IRCA are aimed at employers. Section 101 of the Act establishes penalties making employment of unauthorized aliens unlawful. 8 U.S.C. § 1324a. The employer is required to keep records of the verification of employees' eligibility to work. 8 U.S.C. § 1324a(b)(1)(C). Civil and criminal penalties are provided for violations. 8 U.S.C. § 1324a(e), (f).

While the INS argues that the authority to detain aliens is consistent with the goals and objectives of IRCA, the legislative his-

---

**12.** If immigration is continued at a high level, yet a substantial portion of these new persons and their descendants do not assimilate into the society, they have the potential to create in America a measure of the same social, political, and economic problems which exist in the countries from which they have chosen to depart. Furthermore, if language and cultural separatism rise above a certain level, the unity and political stability of the Nation will—in time—be seriously diminished. Pluralism, within a united American nation, has been the single greatest strength of this country. This unity comes from a common language and a core public culture of certain shared values, beliefs, and customs which makes us distinctively "Americans."

S.Rep. 99–132, 99th Cong., 1st Sess. 7 (1985).

**13.** In the introduction to the Report, the Senate had noted the sense of Congress that resources for direct enforcement and immigration services should be increased. *Id.* at 1.

tory reveals otherwise. The regulation disrupts the careful balance which Congress achieved in IRCA. While Congress initially discussed the merits of fining, detaining or adopting criminal sanctions against the *employee*, it ultimately rejected all such proposals. *Immigration Reform and Control Act of 1985: Hearings before the Senate Subcommittee on Immigration and Refugee Policy*, 99th Cong., 1st Sess. (1985), S.Hrg. 99–273, at 56, 59 (In response to the proposal that aliens be fined or detained as a deterrence to illegal immigration, Senator Simpson, the Chairman of the Senate Judiciary Committee, stated that this was not a new recommendation, but one that had previously been suggested and rejected). *See also* 118 *Cong.Rec.* H30155 (daily ed. Sept. 12, 1972) (statement of Rep. Rodino) (the House Judiciary Committee decided not to impose any additional criminal sanctions or other penalties on employees, believing that such penalties "would serve no useful purpose"). Instead, it deliberately adopted sanctions with respect to the *employer* only. Congress quite clearly was willing to deter illegal immigration by making jobs less available to illegal aliens but not by incarcerating or fining aliens who succeeded in obtaining work. During the extensive debates and hearings conducted during earlier attempts to enact similar legislation, the INS specifically agreed that employee sanctions, such as denying aliens employment pending deportation hearings or detaining aliens, should be rejected. James Hennessey, the Executive Assistant to the INS Commissioner, testified that the INS would not attempt to control employment during deportation proceedings:

> Rep. Rodino: [During deportation proceedings] the fact that an illegal alien is a holder of a job or some employment,

means that there is no such surveillance on the part of the Service or anybody that he won't be holding the job?

> Mr. Hennessey: He will undoubtedly continue. In fact, having still the right to go before the Board [of Immigration Appeals], I don't think we could attempt or ask for any legislation that he not hold the job. We will not expect the individual to starve in the United States while he is exhausting both the administrative and judicial roads that the legislation gives him.

Illegal Aliens, Hearings before Subcommittee No. 1 of the Committee on the Judiciary, House of Representatives, 92d Cong., Serial No. 13 pts. 1–5, pt. 1 at 46. Even an INS District Director for Detroit, Michigan who favored administrative action against illegal aliens who worked, explicitly rejected detention as a means of curtailing immigration:

> Mr. Pederson: I believe that we ought to impose a penalty against the alien to help stop him [from working].
>
> Rep. Rodino: What kind of penalty would you impose on the alien?
>
> Mr. Pederson: Well, I do not feel that a fine or imprisonment is the answer but I do feel that there should be some form of sanction. It could be possible to deny administrative relief of some form.

*Id.*, pt. 3 at 919. The House Judiciary Committee concluded at the end of this round of hearings that "[t]he illegal entrant should not be subject to additional penalties...." *Id.*, pt. 1, at 90.

Although some continued to argue for restraints against the employee, the approach of controlling employment through *employer* not *employee* sanctions was adjudged by Congress to provide the only realistic and appropriate solution.[14] As

**14.** As late as 1985, researcher Dr. Barry Chiswick again proposed to the Senate Immigration Subcommittee that a policy of detaining "illegal worker for a period of several months prior to deportation" should be adopted as a means of deterring illegal immigration. He believed that "[d]etention may be the only mechanism for reducing the extent to which the border is treated as a revolving door" and "a fine in terms of time—detention—for several months would be costly to the alien and have a deterrent effect."

Thus, he strongly advocated the policy which in effect the INS seeks to implement through the proposed regulation, asserting that detention would "offer a better hope than ... employer sanctions." *Immigration Reform and Control Act of 1985: Hearings before the Senate Subcommittee on Immigration and Refugee Policy*, 99th Cong., 1st Sess. (1985), S.Hrg. 99–273, at 44–45. Senator Simpson, the Committee Chairman, noting that the proposal was "not something

stated in the final House report, employer sanctions, "coupled with improved border enforcement, is the *only* effective way to reduce illegal entry and in the Committee's judgment it is the most practical and cost-effective way to address this complex problem." H.R.Rep. No. 99–682(I), 99th Cong., 2nd Sess. 49, *reprinted in* 1986 *U.S. Code Cong. & Admin.News.* 5653 (emphasis added). Thus, Congress adopted "a graduated three-step series of administrative, civil, and criminal penalties for *employers* violating this prohibition." *Id.* at 5656 (emphasis added). The INS regulation would override the clear policy choice which Congress made in IRCA, and would upset the careful balance which Congress achieved in that legislation. The no-work bond condition, and the detention of individuals who violate that condition, is the very type of employee deterrence mechanism which Congress rejected in IRCA. By administrative decree, the agency would now adopt a drastic employee sanction in contravention of a contrary determination by the legislature—and in conflict with the agency's representations before Congress.

Further, while the bond condition has great impact upon the individuals to whom it is applied, it does not reach the vast majority of those who work without authorization. Most aliens arrested by the INS agree to voluntary departure without a hearing. *INS v. Lopez–Mendoza*, 468 U.S. at 1044, 104 S.Ct. at 3486 (97.5% departed without a hearing). Similarly, the regulation does not affect unauthorized employment by those who are released on parole rather than on bond. Therefore, most of those who might work without authorization will not find their incentives to illegal immigration affected by this regulation.

The other provisions of IRCA provide no support for the regulation. Section 103 imposes penalties of fines or imprisonment for fraudulent use of immigration documents or false attestations used to satisfy the verification requirements imposed on employers by the Act. 18 U.S.C. § 1546.

Section 111 deals with appropriations for enforcement and service activities of the INS, including direct border patrols, enhanced community outreach, and adjudication of petitions and other applications under the INA. Pub.L. No. 99–603, 100 Stat. 3381. Section 112 is concerned with penalties for transporting aliens into the United States in violation of the immigration law and, consistent with employer sanctions, removes an exception which had previously exempted employment from penalties for harboring aliens. 8 U.S.C. § 1324(a).

Section 102 includes a carefully drawn provision in which Congress prohibits employment discrimination based on national origin or citizenship. 8 U.S.C. § 1324b. This protection extends to aliens who intend to become citizens, as well as current United States citizens. 8 U.S.C. § 1324b(a)(1)(B), (a)(3)(B). Much of the rest of IRCA is concerned with the legalization of aliens formerly here illegally, a Congressional choice in sharp contrast with the focus of the Internal Security Act on deporting *all* alien Communists, summarized in our first *Carlson* opinion as an authority arising from a "moving factual appraisal of an outstanding conspiracy of aliens and a few mentally intoxicated or drugged citizens and a sprinkling of the vicious, directed by a foreign government." *Carlson*, 186 F.2d at 187.

The emphasis on employer sanctions in IRCA militates against reading in the authority to detain individuals to prevent them from working. The emphasis on the rights of aliens as well as citizens shows a concern for fair and humane enforcement of the immigration laws which is at odds with the blanket no-work rider. It is hard to conceive that Congress, which adopted employer sanctions in the belief that it is "the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens," would condone the harsh and inhumane measures at issue here. H.R.Rep. No. 99–682(I), 99th Cong.,

---

new," and rejected it as "politically harsh [and] unrealistic." *Id.* at 56. He opposed the detention proposal and recommended that Congress try the "most humane" and "the most sensible

humanitarian approach", employer sanctions, first before considering harsher measures. *Id.* at 59.

2nd Sess. 46, *reprinted in* 1986 *U.S.Code Cong. & Admin.News 5650.* The regulation is unlikely to affect those considering traveling to this country because of the lure of jobs; it would, however, have a drastic affect on individuals already in the United States, who may well have a legitimate claim to remaining here. The regulation would force the latter group to choose between starving on the streets or remaining in detention. Any effort on the part of individuals to work. in order to pay for food, shelter, medical care, or to provide for their families, pending resolution of their cases may land them back in jail. The other options might be even less desirable, not only for the aliens but for society as a whole. Surely, Congress could not have intended to reduce these claimants—some legitimate and likely to become future citizens—to such choices in order to survive.

In contrast to Congress' approach in the Internal Security Acts, in which Congress supported detention of alien communists with lengthy findings on the dangers of subversion, Congress in IRCA showed no interest in expanding detention of aliens. The detention presented by the regulation at issue here—detention to prevent unauthorized employment—runs contrary to the fundamental policy determinations made by Congress in enacting the legislation involved. IRCA shows a congressional choice to reduce employment incentives by sanctioning employers, not employees.

Unlike *Flores, supra,* where we addressed a regulation which did not conflict with congressional judgment, here we confront a regulation contrary to a congressional policy choice clearly elaborated in IRCA. Congress made its view known by rejecting provisions for employee sanctions. That rejection necessarily includes sanctions that flow from violations of bail provisions or from incarcerations for refusing to agree not to work.

The only mention of bonds for employees in IRCA is an explicit prohibition which prevents employers from shifting the burden of sanctions. Section 101 includes a provision entitled "Prohibition of Indemnity Bonds," which states:

(1) Prohibition. It is unlawful for a person or other entity, in the hiring, recruiting, or referring for employment of any individual, to require the individual to post a bond or security, to pay or agree to pay an amount, or otherwise to provide a financial guarantee or indemnity, against any potential liability arising under this section relating to such hiring, recruiting, or referring of the individual.

8 U.S.C. § 1324a(g)(1). Violations of this prohibition are subject to civil penalties. 8 U.S.C. § 1324a(g)(2).

The regulation on alien commuters in *Sam Andrews' Sons,* lacked rational relation to the statute because nothing in the statute intimated that Congress intended the green card system to be used as a means of Government intervention in domestic labor disputes. 457 F.2d at 745. There is nothing in IRCA which sanctions money bonds of the type once contemplated in *Toscano–Rivas* being placed upon individual alien workers, and nothing which sanctions detention to prevent these individuals from working. Since the bond condition here is unrelated to the danger of subversion considered by the Internal Security Acts and is contrary to congressional judgment in IRCA, we conclude that to increase detention through use of the rider is an abuse of the Attorney General's discretion.

## D. CONDITIONS PLACED UPON BOND

Finally, we must inquire into what bond conditions can be imposed under this statutory section. In *Flores,* we characterized the regulation governing the release of alien minors as a condition on release, rather than a condition of bond. Still, *Flores'* requirement of a rational relationship to the statute and our approval in that case of the regulation regarding children must be considered in evaluating bond conditions. Because *Flores* found a relationship to appearance, however, it did not evaluate prior cases to determine what other conditions

might be imposed in the absence of the power to detain.

■ Few cases reviewing permissible conditions on bond have arisen under § 1252(a). We examine these cases and find additional guidance in Supreme Court decisions under § 1252(d) which make an explicit comparison with § 1252(a). The cases reveal that the decision to impose conditions upon release must also be guided by informed discretion and does not extend to imposing any condition at all, even when an alien might have been initially detained. When detention is not at issue, the Supreme Court has limited conditions to those related to the alien's appearance for deportation proceedings.

After *Carlson* was affirmed in the Supreme Court, the INS introduced a new type of bond, laden with controlling conditions, for aliens awaiting deportation proceedings. *Yanish v. Barber*, 73 S.Ct. 1105 (1953) (Douglas, J., in chambers). One condition on Yanish's bond barred Yanish from associating with any person who he knew or had reason to believe was a Communist. "[T]aken literally [the condition] would prevent him from living with his Communist wife or going to a movie with his Communist son or seeing his Communist legal adviser or being treated by his Communist doctor." Justice Douglas granted bail without the conditions. *Id.* at 1108–9.

In *Carlisle v. Landon*, 73 S.Ct. 1179 (1953) (Douglas, J., in chambers), the distinction between the initial discretion to detain and the power to impose conditions was even more closely presented. Carlisle was one of the defendants whose detention was upheld by the Supreme Court in *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952). Bail had been granted during the course of the earlier proceedings. Carlisle continued his appeal on the basis that the only recent evidence against him was association with groups found to be "subversive" or "Communist front" organizations, rather than activities within the Communist Party itself. *Id.* 73 S.Ct. at 1180. During his appeal, under the provisions of 242(a), the Attorney General required a bond with conditions similar to those imposed in *Yanish v. Barber*. *Id.* 73 S.Ct. at 1179. When Carlisle refused to accept the new bond, he was redetained. *Id.* at 1181.

Justice Douglas granted bail. During the time Carlisle had been at large he had not done a single unlawful act; he merely refused to execute "the Yanish type of bond." *Id.* at 1182. "Up until then his enlargement on bail had been deemed wholly consistent with the national security. Once he refused to execute the new type of bond he was deemed sufficiently dangerous as to be taken into custody once more." *Id.* at 1182. Justice Douglas found that Carlisle was being detained "solely because he is not amenable to the desires of the Attorney General. That too would be permissible if the Attorney General has acted within the scope of his authority," but that authority was in doubt.

*Carlisle* anticipated resolution by the Supreme Court of the question of the Attorney General's authority to impose bond conditions. However, the lawfulness of restrictive conditions was finally tested in relation to aliens who had been proved deportable and were under continued orders of supervision under 8 U.S.C. § 1252(d). Although early drafts of this provision had authorized indefinite detention of aliens after deportability was determined, indefinite detention was later dropped from the statute to avoid a constitutional question. *U.S. v. Witkovich*, 353 U.S. 194, 200–201, 77 S.Ct. 779, 782–83, 1 L.Ed.2d 765 (1957). Criminal penalties for violations were imposed instead. S.Rep. 2239, *supra*, at 8. The provision authorized the Attorney General, among other things, to require the alien to "give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper." It also required the alien to "conform to such reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case." 8 U.S.C. § 1252(d).

In *Witkovich* and its companion case, *Barton v. Sentner*, 353 U.S. 963, 77 S.Ct.

1047, 1 L.Ed.2d 901 (1957), the Supreme Court limited the apparently broad discretion granted the Attorney General under 8 U.S.C. § 1252(d), holding that conditions must be related to ensuring the alien's appearance for deportation. "A restrictive meaning for what appear to be plain words may be indicated by the Act as a whole, by the persuasive gloss of legislative history or by the rule of constitutional adjudication, relied on by the District Court, that such a restrictive meaning must be given if a broader meaning would generate constitutional doubts." *Witkovich*, 353 U.S. at 199, 77 S.Ct. at 782. The Court restricted the statutory grant of authority despite Congressional intent to control subversive aliens who could not be promptly deported, *id.* at 200–201, 77 S.Ct. at 782–83, which was the main focus of the original Senate and House Reports on the provision, *see generally* S.Rep. 2239, 81st Cong., 2d Sess. (1950); H.R.Rep. 1192 (81st Cong., 1st Sess.).

In *Witkovich*, the Court held that an alien being supervised more than six months after his deportation had been ordered could not be forced to give information about matters unrelated to his readiness for deportation. 353 U.S. at 200–201, 77 S.Ct. at 782–83. Although *Witkovich* dealt only with what information could be required of an alien and distinguished the potentially long duration of supervision under 1252(d) from the "customarily brief" period during which active alien Communists could be detained before deportation hearings, *see* 353 U.S. at 198, 77 S.Ct. at 781 (noting that *Carlson* concerned detention of "active alien Communists"), at 201, 77 S.Ct. at 783 (noting that detention of aliens pending determination of deportability was "customarily brief"), *Sentner* established additional substantive limits.

*Sentner* concerned the Attorney General's authority to prescribe "reasonable written restrictions" on the alien during this period. The restrictions placed on Sentner more closely resembled the condition against employment. Sentner had been supervised under an order which forbade her, among other things, to violate the Smith Act, a deportable offense subject to criminal penalties. *Sentner v. Colarelli*, 145 F.Supp. 569 (E.D.Mo.1956), *aff'd per curiam sub nom. Barton v. Sentner*, 353 U.S. 963, 77 S.Ct. 1047, 1 L.Ed.2d 901 (1957). The supervisory powers conferred by statute could not be used as an indirect means of implementing penalties which already existed under the Smith Act nor adding to the penalties she faced. 145 F.Supp. at 575. Since this provision would not affect most subversives, but only deportable aliens under supervision while awaiting deportation, Congress would not be assumed to have delegated this additional authority in such general terms. 145 F.Supp. at 576.

*Sentner* also held that the alien could not be restricted from membership in the Communist Party, furthering its policies, or associating with Communists. *Id.* at 576–579. Six months after deportability was determined, the only power the Attorney General had was to deport the alien or to supervise her. Supervision was not an end in itself but merely an auxiliary to the power to deport. *Id.* at 577. Statutory interpretation and the principle of avoiding constitutional questions mandated this restrictive reading of the statute. *Id.* at 577–79, 583.

The *Sentner* court read the power to detain reviewed in *Carlson* as concerned with national security, *id.* at 577, 579, and explicitly compared the statutory provision under review there with the one we review here: "It might be suggested ... that the Attorney General has been authorized to prescribe any reasonable written regulation calculated to protect the security of the nation, a standard more or less similar to the standard guiding the exercise of his discretion to detain without bail under Section 242(a)." 145 F.Supp. at 579. Even if the statute authorized such discretion, the conditions imposed would constitute an abuse of discretion in the absence of any threat to national security. *Id.* Restrictions on her conduct were limited to those which would ensure her availability for deportation. *Id.* at 577, 582–83. The Supreme Court affirmed over a dissent which complained that this significantly enlarged

the holding of *Witkovich.* 353 U.S. at 963, 77 S.Ct. at 1047.

Together, the cases on bond conditions show the limits of the Attorney General's power to impose conditions on release. *Sentner's* refusal to find a grant of Congressional authority to control Smith Act violations through this provision is significant: since most aliens arrested by the INS take voluntary departure, *INS v. Lopez–Mendoza, supra,* restrictions on bond conditions only reach a fraction of the population whose employment is regulated under the INA. *Sentner* and *Witkovich* read section 242(a) as concerned with national security. The power to supervise aliens was an auxiliary of the power to deport, not an end in itself. These cases demonstrate that conditions are limited by the same factors which constrain detention: where there is no power to detain, conditions must be related to ensuring the alien's appearance.

### CONCLUSION: THE ATTORNEY GENERAL'S DISCRETION

The essence of the INS position is that when this provision became part of the INA, the power to detain and to impose conditions of bond was vastly increased: from a focus on ensuring appearance or averting serious danger to the nation, such power could now be exercised for any purpose related to the immigration laws. We question whether Congress could have intended such an expansion of discretion without discussion, and our review discloses no authority for this position. In fact, we recently noted the importance of appearance as a focus of the detention power—a position which is consistent with our historic interpretation of this provision. *Flores, supra,* at 1326. In *Sam Andrews' Sons,* we did not rely on the breadth of the INA and its ability to control employment generally, but focused on the goals and purposes of the various provisions of the statute. Case law has established the purpose and limits of the detention power.

In *Ocon,* we treated the Attorney General's discretion under the INA as coextensive with his discretion under the Internal Security Acts; however, *Ocon* concerned an individual who would have been in custody under the Internal Security Acts as well. *See also Sentner v. Colarelli,* 145 F.Supp. 569, 577, 579, *aff'd per curiam* 353 U.S. 963, 77 S.Ct. 1047, 1 L.Ed.2d 901 (1957) (Congressional grant of authority to Attorney General under section 242(a) for purposes of national security). In *Flores,* we noted the requirement of rational relationship to the statute, but did not decide whether this had changed the detention power. *Flores* was in accord with our earlier cases, since the condition it considered was rationally related to ensuring appearance, as was the high bond in *Hernandez–Avila v. Boyd, supra.*

The Supreme Court's affirmance in *Rubinstein v. Brownell* answers the question of the continuity of scope of this provision, since it presented the case of an alien who would not have been detained under the Internal Security Act. 206 F.2d 449 (D.C.Cir.1953) *aff'd per curiam by an equally divided court,* 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954). Rubinstein had been convicted of draft evasion and served time in prison; he had a criminal record. Yet he was "not hostile to the Government or likely to engage in subversive, criminal, or reprehensible activities...." 206 F.2d at 456. There was "no suggestion that he [would] flee or hide." *Id.* He could not be continued in custody under this provision without any indication that he would hurt the country or would flee. Absent such a determination, his detention would have been an abuse of discretion. *Id.* Under *Rubinstein,* therefore, the Attorney General's detention power remained unchanged when this provision became part of the INA.

Whenever the authority granted by this provision was judicially tested under either statute which contained it, the Attorney General's discretion was found to be similar in scope. At the time the provision was enacted, this circuit examined its impact in the light of what we determined was "our government's resistance to as venal an attack on its very existence as the long story of 'man's inhumanity to man'

reveals." *Ocon*, 218 F.2d at 326. In the crucible of concern with national security, we found no broader authority than this:

The Attorney General does *not* have unlimited power to detain. *Carlson*, 186 F.2d at 185. The claim of unlimited power to detain is not, in fact, the exercise of discretion. *Carlson*, 186 F.2d at 189 (Director had argued in the briefs that there was "no question of discretion" but an authority to hold or release an alien without revealing his reason for the choice); *Mangaoang*, 186 F.2d at 197 ("*if* he did exercise discretion in denying bail") (emphasis added). Discretion is delegated to the Attorney General because evil purpose cannot be imputed to all aliens. *Carlson*, 342 U.S. at 538, 72 S.Ct. at 533. He must exercise "*informed* discretion." *Ocon*, 218 F.2d at 524, citing *Carlisle v. Landon*, 73 S.Ct. 1179 (Douglas, J., in chambers). The exercise of this discretion rests upon actions showing participation in activities which endanger the country, in addition to the status (i.e., Party membership) which makes each individual deportable. *Carlson*, 342 U.S. at 541, 72 S.Ct. at 534; *see also Carlson*, 186 F.2d 183. The short duration of detention is not the critical factor. *Mangaoang v. Boyd*, 186 F.2d at 196. "[T]he denial of bail must be based upon some specific fact pointing to the petitioners as bad risks to enlargement upon bail." *Id.*

This controlling authority disposes of the most fundamental claim made in the briefs of the INS: "Once there are sufficient grounds to warrant the arrest of a person as a deportable alien, *any* release is a matter of grace, grantable and revocable by the Attorney General at his discretion." Brief for Appellant at 18. Grounds for deportation are not automatically grounds for detention. Further, the emphasis in these cases on facts as to each individual forecloses the Attorney General's "discretion" to put in place a "presumption" that work is unauthorized, if such a presumption will lead directly to detention. This is supported by the Attorney General's own evaluation of the scope of his discretion in

*Toscano–Rivas, supra*, which claimed no power to detain in response to illegal employment and emphasized the need for "substantive safeguards," contemplating *only* individualized decisions.

The exercise of discretion under the statute must be based on specific facts regarding the individual related to reasons why he is a poor risk for enlargement upon bail or may endanger the nation while he is at liberty. Because the blanket condition is not individualized, it could not be considered informed discretion even if unauthorized employment were grounds for detention. Unauthorized employment has never been held to justify detention, and IRCA made no findings of danger to the nation like the Congressional findings in the Internal Security Act. Informed discretion is incompatible with a blanket no-work provision. The regulation was promulgated beyond the authority delegated by the statute.

The judgment of the district court is AFFIRMED.

TROTT, Circuit Judge, Dissenting:

After *Flores v. Meese*, 913 F.2d 1315, 1322 (9th Cir.1990), our task in this case is uncomplicated: we must decide if the regulation under scrutiny is founded on considerations rationally related to the statute from which it derives.[1] Majority op. at 1360. The answer to this question appears simple.

An unmistakable purpose of the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101 *et seq.* ("INA") is to

provide for the protection of American labor against an influx of aliens entering the United States for the purpose of performing skilled or unskilled labor where the economy of individual localities is not capable of absorbing them at the time they desire to enter this country.

H.R.Rep. 1365, 82d Cong.2d Sess. 51 (1957). As the Supreme Court observed in *Sure-Tan, Inc. v. NLRB*, "[a] primary purpose in

---

**1.** *Flores* holds that the Attorney General is authorized to prescribe bond conditions "beyond merely insuring appearance," At 1325, a holding

recognized by the majority opinion and applied in this case.

restricting immigration is to preserve jobs for American workers." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 893, 104 S.Ct. 2803, 2809, 81 L.Ed.2d 732 (1984). This purpose, if anything, was fortified by the Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359 (1986) which reiterated the desire of Congress to erect at the borders barriers designed to protect U.S. citizens, and others here with lawful permission to work, from competition by illegal aliens not authorized by law to work in this country. The objective of this Act was to stop illegal aliens from working, period.

This proposition to me is so clear that, with all respect to my distinguished and esteemed colleagues, I do not see how it can be debated. I am unpersuaded by the majority opinion's attempt to escape the inexorable weight of the evidence on this issue. The majority opinion's attempt to find something to the contrary in the IRCA's adoption of employer sanctions is thoroughly unpersuasive. In no way do the existence of employer sanctions suggest or imply that unauthorized work by illegal aliens is somehow acceptable. The choice of sanctions does not alter the primary thrust of the legislative scheme which is to deter and to prevent unauthorized employment. Unauthorized employment by illegal aliens remains illegal, and, illegal aliens who are working without lawful authority are still expected to be stopped and to be calendared for removal from the country.

The disputed regulation furthers this goal. It says to persons apprehended and waiting to be considered for deportation that if they are to be released on bond pending resolution of the proceedings, they cannot work. In my view, the majority opinion improperly invades the province of the Attorney General, and I would reverse the district court.

But I am not sure what this case is about. The INS in its brief assures us that the disputed regulations "bar only *unauthorized* employment" (emphasis in original). I read the majority opinion as being willing to go along with such a regulation, but not having any confidence in the integrity of INS's representation, choosing instead to try to find a way to discount it and construe the regulation as covering *all* employment, even if otherwise lawful or authorized. Majority op. at 1353–1354. The majority opinion in essence prohibits the INS from doing something it claims it does not want to do, i.e., bar all employment by persons released on bond, even if the person has a legitimate right to work. This puts us in the position of refereeing a noncontroversy. I suppose its none of my business, but it seems the way out of this power struggle is for the INS to cure the ambiguities in its regulatory scheme so that the regulations accurately reflects its objective, which is to prevent aliens who are not authorized to work from doing so while they are out on bond. This hardly seems controversial. If that is all INS wishes to do, it has the untrammeled power to get it over with and end this debate.

I DISSENT.